# Natchez Insurance Company *v.* Buckner *et al.*

In an action on a valued policy to recover damages for a partial loss, the damage to be assessed by the jury is the difference between the appraisement of the damaged article and that stipulated in the policy, with all necessary damages.

The proper method of ascertaining the amount of the damage on a valued policy by partial loss, is by an appraisement by persons whose experience gives them a competent knowledge of the value of the article and the amount of injury sustained.

IN error from the circuit court of the county of Adams.

This was an action of covenant brought in the Adams circuit court, founded upon a policy of insurance, executed by defendants below to the plaintiffs, who sued for a loss sustained by damage done, by the leaking of the boat occasioned by a storm, to 459 bales of cotton, shipped on board the steamboat Fort-Adams, bound to New-Orleans and the intermediate ports. The insurance was against loss by fire and water.

The defendants below pleaded, 1st, that the necessary preliminary proofs were not furnished to them sixty days before the commencement of suit; 2d, that plaintiffs had not paid the premiums upon the cotton insured under the policy; 3d, that the said cotton was not shipped by Stanton, Buckner & Co. to Buckner, Stanton & Co. of New-Orleans, according to the terms of the policy; 4th, that the plaintiffs did not sustain loss to the amount of damages mentioned in the declaration upon any cotton insured by said policy of insurance; and, 5th, payment. There was no general issue.

On these pleas issues were joined to the country, and the jury found the defendants guilty of a breach of the covenant, as charged in plaintiffs' declaration, and assessed the damages to $10,226 39.

It appeared in evidence, upon the trial, that when the damaged cotton arrived in New-Orleans, and was taken from the wreck of the steamboat Fort-Adams, the plaintiffs below called in two cotton brokers to estimate the damage, who made their estimate,

after examination by a per cent. valuation, without regard to any particular price, by fixing the depreciation of every particular lot at a given per cent. For example, a lot of thirty bales, marked M. N. Brandon, had been depreciated thirty per cent. This thirty per cent. was in reference to the intrinsic value of the article, without regard to what that value was. The plaintiffs then, after forty-eight hours' notice, sold the cotton to the highest bidder, at public auction, where it brought a less price than that determined upon as its value by the brokers who appraised it.

In the course of the trial, the plaintiffs below offered to read as testimony the preliminary proofs of loss furnished to the defendants sixty days before suit brought, according to the stipulations of the policy, to the reading of which the counsel for the defendants objected, on the ground that no evidence applicable to the bills of lading was furnished to the defendants sixty days before the suit was brought, for the reason that the plaintiffs charged a claim for the loss of others, and that the defendants could not be sued by Stanton, Buckner & Co. on this policy. But the interest of the plaintiffs in the cotton had been previously admitted by agreement. The objection was therefore overruled.

Ferriday, one of the cotton brokers, was introduced by the plaintiffs to prove the appraisement and damage to the cotton and the extent of it, and the expenses incurred. His testimony was excepted to by the defendants, but admitted by the court.

The deposition of one Cenas, the auctioneer, was introduced to prove what the cotton sold for at public sale, and the deposition of Mr. Poor, a clerk of Stanton, Buckner & Co., was read to prove the reception of the cotton, and the damage, and the ruling prices of cotton from Mississippi, at both before and at that time, but was objected to by the defendants, on the ground, that, no such evidence was laid before the company, and that it did not apply to any cotton covered by the policy, and could not be offered by the plaintiffs after the proof of the appraisement.

The protest, bills of lading, account of appraisement, account of sales of damaged cotton, were admitted by agreement by the defendants, who waived all objections on the ground that they were not presented to the defendants sixty days before suit brought. The defendants also admitted, that the plaintiffs pos-

sessed the necessary interest in the cotton; and that all necessary diligence had been used by the plaintiffs and their servants, for the safeguard, recovery and defence of said cotton, and also, that monthly statements were furnished of the cotton shipped, according to the terms of the policy.    The defendant introduced a witness named Henry to prove who were the owners of the cotton shipped under the policy, which testimony was excluded by the court.    Proofs of certain sett-offs were admitted by plaintiffs.

After verdict, the defendants moved the court for a new trial, which was over-ruled.

Winchester, for plaintiffs in error.

The verdict of the jury, is a general verdict of guilty of a breach of the covenant, for which (independent of defendants offsetts which amounted to $2274 63,) they have assessed $10,226 39, damages.

Defendant might rest his right to a reversal of the judgment solely upon the verdict, as there is no general issue in the case, and there is no finding of the jury upon the issues joined.

But as there are many other questions in the case, upon which it is desirable to have the decision of the court, as a rule for a future trial of the cause, they will be presented for the consideration of the court.

1. The court below erred in permitting the evidence of Ferriday to go to the jury, to discredit the appraisement, as evidence of the damage done to the damaged cotton, it being the only evidence of the extent of plaintiffs' loss, which was exhibited by the plaintiffs to the defendants, 60 days prior to the commencement of the suit. See pages 32 & 33, of the record, 1st bill of exceptions, and page 45, 2nd bill of exceptions.

2. The court ought not to have permitted Poor's answer to the plaintiffs' interrogatory to be read to the jury.

1. Because it shewed what had been the prices of good undamaged cotton from the 10th of November, 1836, to the 31st of December, 1836, and did not shew what were the market prices on the 3rd and 11th of January, 1837, the days on which the damaged cotton was sold.    The object of the proof was to shew the extent of plaintiffs loss by the damage done to the cotton

That loss may be ascertained by shewing the difference in value between the same cotton in a damaged and undamaged state.  If that difference is attempted to be proved, by sales of the damaged cotton at auction, and sales of undamaged and good cotton, they ought to be sales on the same day.  If the price of cotton in the market of New Orleans, was 18 cents in November and December, and only 12 cents on the 3rd and 11th of January, these two sales at different times, would not shew the difference in the value of damaged and undamaged cotton.  If the damaged cotton had been sold when cotton was up to 18 cents, it would have brought a proportionably higher price, than it did bring when cotton was down at 12.  Good cotton being at from 15 to 18, from November to the last day of December, is no evidence that it remained that high on the 3rd and 11th of January.  A single arrival from Liverpool on the 1st of January might depress the market to 12 cents.  The plaintiff was bound to prove the extent of his loss, or the difference in the value of his cotton in the market, produced by its being damaged.  If he undertook to do this by evidence of the value of good cotton in the market, compared with the price which the damaged cotton sold for, it ought to be evidence of the value of good cotton on the day which the damaged cotton was sold, and not its value at a different period of time.  At least plaintiff should have shown what were the prices after as well as before the sale of the damaged cotton.  Such evidence would be better evidence, than evidence of prior sales only, and they are bound to produce the best evidence.  This failing to do so, when it was in their power, shews that they withheld it because it would have been against them.

The point the plaintiff was bound to prove, was the difference in the value on the day the cotton was sold.  Suppose the cotton had not been damaged on the 3rd and 11th day of January, what would it have sold for at auction on those days.  The difference between what it did sell for, and what it would have sold for, is the exact loss, upon which the company agreed to pay at the rate of 70 dollars per bale.

For example, if on the 3rd of January, the same bale of cotton in an undamaged state would sell for 50 dollars, and it is sold in a damaged state for 25 dollars, there is a loss of one half its value.

[Natchez Insurance Company *v.* Buckner *et al.*]

The same bale if it would have sold for 100 dollars in an undamaged state, would in its damaged state have sold for 50, and the loss would have still been the same, to wit, one half its value, or which is the same thing, equal to the entire loss of half a bale. In both cases, the defendants would have had the same amount to pay, upon the loss, viz: the price of half a bale valued in the policy at 70 dollars a bale, that is 35 dollars.

But it is obvious, that the price of an undamaged bale sold at 100 dollars in November, when the same bale on the 3rd of January would sell for only 50, compared with the sale of such bale damaged on the 3rd, would not by the difference, shew how much the cotton had been damaged. Instead of a difference of one-half, it would shew a difference of three-fourths, when in reality the bale is only damaged one half.

2. But a still stronger objection to this answer of Poor's is, that it is not in answer to any question put by the plaintiff to the witness in his interrogatories. Had this question been asked, the defendant would have been notified, and might have cross interrogated him, by asking what were the highest sales on the 3rd and 11th of January, and subsequent thereto. The statute, which requires a copy of interrogatories to be served, and notice to be given to the opposite party, would be nugatory and is entirely useless, if material evidence may be read, which is not in answer to any interrogatory, and upon which no means were afforded to cross interrogate.

A third reason why Poor's answer should have been rejected, is, because by the terms of the policy the plaintiffs were bound to exhibit to the company proof of their loss, and no debt or cause of action could arise upon the loss until sixty days after the exhibition of such proof. Now the only proof of the extent of the plaintiff's loss ever exhibited to the board, was the appraisement. If the plaintiffs had added to their proofs, proof that the 266 bales had been shipped by them under the policy, the company would have been bound to pay them sixty days afterwards, to the amount shewn by this appraisement upon these 266 bales. It would have been done, too, unless plaintiffs had refused to accept it, and in that case the company could only have been bound to the extent which they appeared to owe upon the proofs exhibited.

Plaintiffs never exhibited any proof to the company of the price of good cotton in the market, with which to compare the value of the damaged cotton as shewn by the sales.

Their only evidence of loss upon these 266 bales was the appraisement. Can they be permitted to come in on the trial and discredit the only proof of loss they ever exhibited, and then in- troduce proofs of loss which they never exhibited, when by the express terms of the policy, the company are not bound to pay until sixty days after proofs exhibited and adjustment.

What is the object of this clause? It is that the directors of the company, acting as trustees between the stockholders and the in- sured, may be able to ascertain what is the extent of the loss, make an adjustment, and not be under the necessity of either in- curring the trouble, vexation and expense of a law-suit, or else paying in the dark, for a loss, the extent of which they are igno- rant, and the reality of which they are uncertain.

If at the time this action was brought the defendants were in- debted in *presenti* to the plaintiffs for a loss upon the policy, it was only for the amount which appeared upon proofs exhibited sixty days before suit commenced.

As the appraisement was the only proof of their loss exhibited, we say in this action they can recover no greater sum than that proof shewed to be due, and therefore the evidence of Ferriday discrediting that proof, and the evidence of Poor, shewing a greater loss by another mode of proof, not exhibited to the company, were wholly inadmissible.

For each of the above reasons, the court erred in overruling the objections of defendants below to the answer of Poor.

3d. The jury treated this case as a total loss, in which the plaintiffs had a right to abandon and did abandon, the damaged cotton to the insurance company, and the court did the same, by permitting the evidence of Ferriday to go to the jury to establish the sum of $1072 65 expenses of freight on the damaged cotton in taking it to New Orleans, and expenses of drayage, handling, brokerage, commissions, and sales after it arrived there.

The plaintiff in his account charged the company with the 266 bales at seventy dollars per bale, and then gave them credit with the nett amount of the sales of the damaged cotton after deduct-

ing all expenses, as if the damaged cotton had changed owners and had become the property of the company, and had been shipped to New Orleans from the wrecked Fort Adams, and sold there on account of the company.

The jury accordingly rendered their verdict by charging the company with 266 bales at seventy dollars a bale, and crediting them with the nett amount of sales of the damaged cotton deducting from the gross amount the expenses of freight and sale.

Thus,

| | | |
|---|---:|---:|
| 266 bales at 70 dollars per bale, is | $18620 | 00 |
| Deduct gross amount of sales at auction, | 7750 | 00 |
| | 10870 | 00 |
| Deduct defendants off-sets under plea of payment, | 2274 | 63 |
| | 8595 | 37 |
| Add interest 10 mo. from 19th September, 1837, the time suit was commenced till July 14, 1838, time of verdict, | 558 | 39 |
| Add expenses of freight and sales on damaged cotton, | 1072 | 63 |
| | $10226 | 39 |

This was an entire error.

1st. Because it was not a total but a partial loss. And plaintiffs had no right to abandon.

2d. Because plaintiffs never did abandon. Smith's Mercantile Law, page 144, marginal, 240.

But it was insisted on the trial by plaintiffs' counsel, and will be again insisted on here, that as this was a valued policy in which the cotton was valued at seventy dollars per bale, that the true rule of calculating the damage upon the loss, which insurer is to pay, is to deduct the sales of the damaged cotton from their whole amount at seventy dollars per bale. If this were true, it would at once convert a partial loss into a total loss. But the mistake of counsel of plaintiff below arises from supposing that the loss is to be ascertained from the valuation in the policy and the sales of the damaged cotton. Whereas, the valuation in the

policy only shews at what price the article was insured, at what rate the company are to pay upon the loss, when the extent of the loss is ascertained. The valuation in the policy has nothing to do with ascertaining the extent of the loss. It might be insured at one thousand dollars per bale. Yet if cotton was only worth sixty dollars per bale, and was so damaged that it would only sell for one-half of sixty, the extent of the loss would only be thirty dollars, or one-half a bale, for which the company would have to pay half their valuation of a bale, or five hundred dollars, and not the difference between thirty dollars and one thousand, which would be paying the plaintiff not only at the rate of one thousand dollars per bale upon his loss of half a bale, but also paying for the half bale upon which he sustained no loss. Whatever may be the aliquot part, which a bale is depreciated in value by being damaged, whether a half, a quarter, an eighth, or an hundredth part, that is the loss upon the bale, and it is the same as if such aliquot part had been wholly destroyed and the residue had been wholly uninjured. Whatever that portion of the value, or of the bale, may be, that is lost or destroyed, that same aliquot part of seventy dollars, the company have to pay.

For example, if the 266 bales on the 3d and 11th of January, in an undamaged state would have sold at $60 per bale, then their whole value on those days in a sound state would have been $15,960. But they sold for $7750, which shows a loss in their value of $8,210. Convert this loss in value into a loss in cotton, by dividing it by 60, the value of a bale, and we have 136 bales and 5-6 of a bale, the entire loss. Upon this loss, the company are to pay $70 per bale, which on the 136 bales amounts to $9,520, and on the 5-6 of a bale to $58 33⅓, or $9,578 33⅓, on the whole.

The result would be precisely the same, if the 266 bales had been worth $200 per bale on the 3d and 11th of January, as in that event, the damaged cotton would have sold for a proportionately higher price. In other words, the damage done to the cotton always remains precisely the same, whatever may be its price in the market, and to ascertain what the extent of its damage is, by a comparison of its value, we must ascertain what is its value damaged and undamaged at one and the same time, or when the prices in the market at different times, are one and the same,

[Natchez Insurance Company *v.* Buckner *et al.*]

This too, conclusively shows, that it makes no difference, either to the insurer or the assured, whether the cotton is delayed in getting to market, and a rise or fall has escaped him by the accident, upon which he either makes a gain or a loss.    It is only the damage done to the cotton by the accidents, which are insured against, which is covered by the policy.

They do not insure the state of the market, or against delays in arriving at the market.

So that the cotton, when it arrives, is wholly undamaged, it makes no difference when it arrives, by what accidents it is delayed, or what may be the gains or losses arising from delays in the rise or fall of the market, there is no breach of the covenant in the policy.

It is for the damage done to the cotton, and that alone, which the insurers are bound to indemnify the plaintiffs.    And when they pay them at the rate of $70 per bale, upon the loss actually incurred by the damage done to the cotton by the accident insured against, they fully comply with their contract.

But they are not bound to pay for any other loss, than the loss sustained by the damage done to the cotton, except such expenses as might be incurred in saving the cotton from the wreck and securing it from further damage.

They are not bound for the expense which the owners of it incur, after it is saved, in taking it to market and selling it after it is there.

This would be the case, if plaintiffs had a right to abandon it, and did abandon it, so as to make it the property of the company. But as long as it is the property of plaintiffs, they must bear their expense of freight in getting it to market, and of drayage, handling, brokerage and commissions, of selling it after it is there, in its damaged state, precisely the same as they bear their expenses in case it is undamaged.    If they are compelled to pay any additional freight on it, their recourse must be upon the freighter, the carrier who has received pay to carry it to market, and not upon the insurance company.    The insurance company may have made an insurance on the freight, and if they can be compelled to pay here under the clause that the insurer shall labor and travel, &c.,

which has nothing to do with these expenses, why they may again be liable upon another policy given to insure the freight.

The court, therefore, erred in permitting Ferriday's evidence of these expenses to go to the jury, and both the court and jury evidently mistook this for a case in which the plaintiffs had a right to abandon and did in fact abandon the damaged cotton to the underwriters for a total loss, neither of which is true.

4. According to the evidence of Poor, the undamaged cotton in Begg's mark, which arrived sound, and was sold on the 31st of December, at private sale, sold for $60 a bale only, that Rowley's Marengo sold for $58, and that marked T. A. at only $56. Begg's and Rowley's cotton are among the best cottons sent from about Natchez.

If, therefore, this evidence was admissible at all, the jury were not warranted in estimating the value of good cotton to be higher on the 3d and 11th of January, than these sales, four and fifteen days preceding.

Taking $58, therefore, as the probable average value of the cotton, on the 31st December, admitting it to have kept up to that price to the 3d and 11th of January, 1837, its entire value, had it been undamaged would have then been $15,428. From this, deduct the amount of the sales at auction of the damaged cotton, $7,750, and it leaves $7,678, the entire loss. This turned into bales, by dividing it by $58 the price of a bale, gives 132 bales and 11-29 of a bale, which at $70 a bale is $9,266 55, from which deduct 2 per cent according to the policy, $195 32, and the amount of defendant's offsetts under his plea of payment $2,274 63, viz: $2,469 95, leaves $6,796 60. This is paying $1,588 55 more than a complete indemnity, in consequence of the high valuation in the policy.

This is the utmost, that the jury were entitled by law or warranted by the evidence before them, to find against the company.

5. But undoubtedly the court will decide, that the defendants have a right to insist on confining the plaintiffs to their own appraisement, which alone they exhibited to the board.   1. Because no debt became due under the policies until sixty days after proof of loss and adjustment.   2. Because it is the customary mode of

proof. 3. Because it is more fair, certain and satisfactory evidence of the extent of the damage done to the cotton, and of the loss sustained, than hasty sales at auction of the damaged cotton at one period of time, and careful private sales of good cotton at another period of time, without any evidence that the market prices of good cotton were the same at these two periods of time.

The auction sales are a very unfair test of the value of damaged cotton. It seems also that the sale on the 11th was a second sale on account of        , who did not comply with the terms of the first sale. No account is exhibited of what this cotton sold for at the first sale. Ten bales of a lot were bid off, with the privilege of the purchaser to take the whole fifty or sixty bales of the same lot.

Suppose the plaintiffs had understood this cotton was their own, and could not be sold on account of the Insurance Company. Would they not have then sold at private sale, with the same care to get its full value, the value at which it was appraised by their own brokers, as they took to get at their private sales of good cotton? It is evident the damaged cotton was sacrificed at auction. This appears from the great sacrifice on all the large lots, below what it was appraised at by the appraisers.

An imperfect exhibition of sales at auction of the damaged cotton on the 3d and 11th of January, 1837, and of private sales of good cotton from the 11th of November to the 31st of December, 1836, without any evidence that the market was as high on the two latter days, as during the months of November and December, afforded no evidence of the damage done to the two hundred and sixty-six bales of cotton, from the difference in its value as damaged and undamaged cotton.

But the appraisement of the brokers afforded the very best evidence. Ferriday says he and the other appraisers took the usual method of examining the cotton, by cutting the ropes and tearing open the bales, and although he says it is impossible on such an examination to ascertain the damage with certainty, yet he does not say that the brokers could not ascertain with as much certainty, as the bidders at a public auction. If the cotton had been offered by Buckner & Stanton at private sale, samples of it ex-

hibited, and the appraisement of the brokers, it would doubtless have sold something near its appraised value.

In every view of the matter, it appears just and reasonable, that the plaintiffs should have been confined to the appraisement as evidence of their loss; and at all events that it is the only evidence in the cause of their loss; the plaintiffs, if they are permitted to resort to proof of sales of damaged and undamaged cotton, which they never exhibited, and to discredit the appraisement which alone they did exhibit sixty days before suit, having wholly failed to show, by this mode of proof, what was the difference in the value of the cotton from its being damaged, on the days of its sales at auction.

According to the appraisement by the brokers, what was the amount which the jury could allow for the damage done to the 266 bales. See appraisement by Rainey, Vallie, Spangelberd & Ferriday, pages 22 and 23 of the record.

33 bales, Rowley's, appraised as damaged 25 per cent.

33 bales, at 70 dollars per bale, as valued in the policy, amounts to 2,310 dollars, upon which 25 per cent. is $577 50.

58 bales, Donoho's, at 50 per cent. 58 multiplied by 70 per bale, is 4060, upon which 50 per cent. is $2,030.

Beggs's 14 bales, at 15 per cent.

15 bales, at 70 dollars per bale, is 980, upon which 15 per cent. is 147 dollars.

Green's 57 bales, damaged 35 per cent.

57 bales, at 70 per bale, is $3,990, upon which 35 per cent. is $1396 50.

Dunbar's 61 bales, at 40 per cent. damage.

61 bales, at 70 dollars per bale, is 4270, upon which 40 per cent. is 1708 dollars. Add 70 dollars for one lost bale, is $1778.

T. A.'s 43 bales, at 30 per cent. damage.

43 bales, at 70 per bale, is 3010 dollars, upon which 30 per cent. is 903 dollars.

RECAPITULATION.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 33 | bales, | Rowley's, | $70 per bale, | damaged | 25 | per cent. | $577 50 |
| 58 | " | Donoho's, | " | " | 50 | " | 2,030 00 |
| 14 | " | Beggs's, | " | " | 15 | " | 147 00 |
| 57 | " | Green's, | " | " | 35 | " | 1,396 50 |

[Natchez Insurance Company *v.* Buckner *et al.*]

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 62 | " | Dunbar's, | " | " | 40 | " | 1,778 | 00 |
| 43 | " | T. A.'s, | " | " | 30 | " | 903 | 00 |

|  |  |  |
|---|---|---|
|  | 6,832 | 00 |
| Deduct 2 per cent. on 6,832, the loss as per policy, | 136 | 64 |

Leaves the amount due plaintiffs, at 70 dollars per bale, on the damaged 266 bales, according to the proof of the appraisement,                                $6,695 36
Deduct defendants' off-sets, under plea of payment,        2,274 63

The amount for which the verdict should be,        $4,420 73

6. If the plaintiffs had exhibited proof to the Board of Directors of the Insurance Company of the shipment of these 266 bales, which it is shown they did not, then, upon this proof and the appraisement which was exhibited, the company could have adjusted the loss at the above sum of 6,832 dollars, from which they would have been entitled to deduct the 2 per cent. and their premiums due, to wit, the off-setts, which would have left 4,420.73-100 dollars, the sum to be paid by the company 60 days after such proof of loss and adjustment.

The Court must see that the Board, as faithful trustees between the stockholders and the assured, could not have paid any larger sum upon the proofs exhibited of the loss. This they would have been bound to have adjusted and paid, if there had been any proof of the shipment of the 266 bales under the policy.

But no such proof was exhibited. See evidence of Pitcher Page.

Instead of this, Buckner & Stanton present a claim of a balance $15,018 42-100, due from the Board, as for a total loss of 327 bales, as shipped under the policy, allowing us on the account a credit for the nett proceeds of the auction sales of 316 bales, as if it had been abandoned to the underwriters, and charging us with all expenses upon its shipment and sales.

The only proofs accompanying this claim are two accounts of auction sales of the damaged cotton, (one of which, on the 11th of January, 1837, was an account of a Mr. Loomis, see page 19,

for 101 bales, the expenses of which sale are charged to the company, and no account of the first sale furnished,) and an appraisement by brokers of the per centum of damage the cotton had sustained, but accompanied with no proof of shipment on account of Buckner, Stanton & Co. under the policy.   On the trial, they show a shipment of only 266 of the damaged bales, instead of the 327 bales.

Plaintiffs, on the trial, also admitted that the cotton marked J. F. Bluffs, embraced in the account, for *26 bales, page 26, was not* shipped under the policy.

What were the directors to do upon this state of the proofs before them?   It certainly would have been a gross violation of their duty, to have agreed to pay and allow Stanton & Buckner's account for $15,018 43.   If they had been satisfied of the shipment of the 266 bales under the policy, they could not, upon the proof of loss exhibited to them, have allowed a larger balance, after deducting their 2 per cent. and premiums due, than $4,420 73 without a gross violation of their duty.

If then, it was not their duty to allow more than this sum upon the proofs exhibited, if it would have been a violation of duty and a breach of trust to have allowed more upon these proofs, can it be said that upon proofs exhibited to the company 60 days before suit commenced, there was due to the plaintiffs $12,501 39, the amount of the verdict?

The company refused to pay plaintiff's account for want of proof.   And until 60 days after such proof is exhibited, no debt is due, whatever may be the loss.   This is the contract of the parties, and it is a reasonable contract.   Without it, the company would either be compelled to pay in the dark, any amount which might be claimed whenever a loss happened, or else submit to the vexation and expense of a law suit to ascertain how much they ought to pay.

The company have no disposition to avoid the punctual payment of every just claim to the utmost extent of loss incurred. But they have a right to require proof, and to know the extent of the loss upon which they are to pay.   If the verdict of the jury in this case, had been for no more than appeared to be due upon

[Natchez Insurance Company *v.* Buckner *et al.*]

the evidence in this case, the company would have been satisfied with it, although the proofs were not exhibited according to the terms of the policy.

It is not the interest or for the credit of the company to go to law, or to delay and dispute just claims, as the directors very well know.   But it would be an abandonment of duty to pay any and every claim that might be presented, without requiring an exhibition of the requisite proof.   Nor could they with any justice to the stockholders, submit to a verdict for $10,226 39, when, under any view of the proofs in the cause, (to wit: according to the proofs in objection 4th ante.) $6,796 60 was the utmost the jury were warranted to allow, and when if Poor's evidence had been ruled out, they could only have allowed $4,420 73.

7. There are other grounds in the record upon which the judgment ought to be reversed, and the verdict set aside.·  Such as the want of an averment that Natchez and Fort Adams, where the *cotton is averred to be shipped,* were intermediate ports between Grand Gulf and New Orleans.   Without such an averment, no cause of action is stated, because it is only such shipments that are within the policy.   It is therefore, not cured by the statute of Jeofails.   The protest offered in evidence shows that the plaintiffs increased the dangers of the steamboat's sinking and leaking, by attaching to her a brig, and thereby discharged the underwriters. But these objections are not insisted on.

In conclusion, plaintiff in error claims a reversal of the judgment upon all and each of the following causes:

1. Because there is no verdict on any of the issues joined, and there ought to be a verdict on each.   Brocker *v.* Kinney, 2 J. R. 216.    2 Caine's R. 81. Van Ben Thusen *v.* De Witt, 4 J. R. 213.

2. Because the court overruled the objections of defendants below to Ferriday's evidence, discrediting the appraisement of the broker's as proof of the extent of damage done to the cotton, when it was the only proof exhibited by plaintiffs to defendants, of the extent of damage 60 days before suit.   Graham on new trials, page 237.

3. Because the court overruled the objections of defendants to Poor's answer, it being no answer to any interrogatory put to him by plaintiff, and such evidence being inadmissible to prove the ex-

tent of the loss, it being evidence of private sales of good cotton, solely, at periods of time several days anterior to the auction sales of the damaged cotton, and affording no test of the extent to which the cotton was injured, and never having been exhibited to the company.

4. Because the court overruled defendant's objections to Ferriday's evidence of the expenses of $1,072 65, incurred for freight, drayage, handling, commissions and sales of damaged cotton.    8 J. R. 321.    2 East, 531.    13 East, 323.    3 Camp. 319.    Rule is difference in the gross and not nett value of damaged and undamaged.

5. Because the jury have rendered a verdict, as in case of a total and not a partial loss, and as if the plaintiffs had abandoned the damaged cotton to the defendants, when they neither abandoned nor had the right to abandon.    2 Burr, 467.    2 East, 581.    12 East, 639.    2 Maule & Selwyn, 639.    3 Kent 281.    5 Maule & Selwyn 47.

6. Because upon the evidence and proofs exhibited to the company, 60 days before suit commenced, no debt was due the plaintiffs at the time the suit was commenced.

7. Because admitting there had been proof exhibited of the shipment of the 266 bales of cotton under the policy, upon the proof of loss exhibited, to wit: the appraisement by the brokers, only $4,420 73 was due upon the proofs exhibited 60 days before the commencement of the suit, which is all the directors could have been authorised to pay, and which is therefore the utmost for which the plaintiffs had a right of action, when their suit was commenced.

Montgomery and Boyd on the same side.

Gaines and Addison for defendants in error.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

This action was instituted by the defendants in error against the plaintiffs in error on a policy of insurance to recover damages for an injury sustained on a quantity of cotton insured by the plaintiffs in error, and shipped on the steamboat Fort Adams from Grand Gulf and intermediate ports to New Orleans.    The plaintiffs below recovered judgment for $10226 39, which the defend-

ants say is greatly too much, and the cause comes up by writ of error on exceptions taken at the trial.

It is admitted in argument that damages had been sustained, and that the plaintiffs below had a right to recover by a fair rule of computation, but the rule by which the damages should be estimated, is the principal subject of dispute.   It is a *valued* policy in which each bale of cotton is valued at seventy dollars, and the loss was only partial, by 266 bales being deteriorated in value.

By first fixing the true rule by which the damage is to be estimated, and then by testing the various objections taken at the trial in reference to their application to, or effect on that rule, we shall be able to divest the case of much of the obscurity in which it has been involved by irrelevant matter.   In fact, rightly considered, it presents but little more than a mathematical proposition.

Insurance is a contract for indemnity, by which one party engages for a consideration, that the goods insured shall arrive safe at the port of destination, or in case they should not, he will place the other party in as good a condition in reference to the thing insured as he was before he began the adventure, but not in a better situation.   When goods are shipped under an open policy and lost, the only means by which he can be placed in such a situation is by paying the invoice price at the shipping port with the reasonable charges.   When they arrive at the port of destination, but in a damaged state, the difference between their value in a sound and the damaged state at that port is to be paid, because that is the only criterion by which the extent of damage can be ascertained, or the proportion in value of the damaged article to the good one.   By first ascertaining the injury and then the value of the thing were it uninjured, the party is indemnified by making up the difference.

In a valued policy the value of the thing is fixed by the contract of the parties, and requires no proof, and this constitutes the only difference between an open and a valued policy.   The value being agreed on, it is binding on both parties, and cannot be opened unless the fixed value is so exorbitant as to make it a fraudulent or gambling policy.   Although some authors at one time seemed to have inclined to the opinion that in partial losses a val-

ued policy must be opened, yet the rule is now too firmly fixed both on authority and reason, to be shaken, that a valued policy cannot be opened, and that the agreed value must hold both in total and partial losses.   The rule is stated with great clearness in the writings of Benecke and Stevens, as compiled by Phillips. The author, (Benecke,) says, " whenever a valuation is made in such a manner that its validity cannot be disputed in case of a total loss, it ought to be the basis of indemnity also in case of a partial loss.   The contract between the underwriter and the assured being that the former is to restore the latter, from any loss arising from the perils insured against, to the situation in which he was with regard to the value of his goods, before the adventure ; and the valuation in the policy being admitted to represent that value, there is not the least ground to depart from that stipulation when a part only has been destroyed, or which comes to the same when the whole is damaged."   Average and Marine Insurance, 48.   After noticing many of the authorities, the same author in conclusion says, " The opinion, therefore, of those who pretend that in case of a partial loss the valuation ought to be disregarded, seems to be as destitute of authority, as it is void of justice and sound reason."   Id. 52.   The conclusion of Stevens is equally clear to the same point, id. 4 ; and Phillips in his own treatise on the law of insurance, after reviewing the authorities, holds to the same rule.   1 Phillips on Insurance, 314–15.   It is also the rule which was adopted by Lord Mansfield in the case of Lewis *v.* Rucker, 2 Burrow, 1167, and admitted to be the true one by Lord Ellenborough in the case of Asher *v.* Noble.   12 East, 639.   In the case of Lewis *v.* Rucker, Lord Mansfield said " as the insurer pays the whole prime cost, if the thing be wholly lost, so if it be only a 3d, 4th, or 5th worse, he pays a 3d, 4th, or 5th of the value of the goods so damaged."   The case in which this opinion was announced, differed not at all in principle from the one before us.   A different mode of ascertaining the damage had been adopted from necessity.   The sugar being damaged, it was necessary to sell immediately, but as the amount of sale furnished no criterion by which to fix the relative valued price insured at, it was necessary to ascertain the price of good sugar at the same time ; when that was done the proportion which the

price of the damaged bore to the value of good sugar, was equal to the proportion which the quantity of injury bore to the insured price.

The valuation in the policy furnishes no rule or criterion by which to arrive at the damage, or in other words it does not furnish in itself, the means to attain the end; but where the damage is ascertained, the proportion which it bears to the price insured is the sum to be paid; and it makes no difference whether the goods go to a losing or gaining market. The actual deterioration is all that the insurer has to pay.

The interest of Stanton, Buckner & Co., in the cotton insured, was $70 per bale, and the proportion which the amount of damage on each bale bears to that sum constitutes their indemnity. Whenever it is ascertained how much injury has been done, the indemnity is complete by paying that amount. For instance, suppose a bale of cotton to be insured at $50, which is damaged on the voyage 10 per cent. which is five dollars: by paying this sum the party receives his own price for his cotton, and is in as good a condition as he was when he shipped it.

Under this rule if we are furnished with the means of ascertaining the proportion which the damage bears to the interest or price insured, we shall be able to arrive at absolute certainty. Will either of the two plans furnished us supply the *desideratum.*

The first mode taken to ascertain the extent of damage was to have it assessed or fixed by two cotton brokers; the second was to sell it at auction.

When the cotton arrived in New Orleans from the wreck, the plaintiffs below called in two cotton brokers to estimate the damage, and they made their estimation after a thorough examination, by a per cent. valuation, without regard to any price, thus fixing the depreciation of every particular lot at a given per cent.; for example, the lot of thirty bales marked M. N. Brandon, had been depreciated 30 per cent. This 30 per cent. was of course in reference to the intrinsic value of the article, it being immaterial what that value was; thus, the thirty bales above mentioned, at $70 per bale, were worth $2100: thirty per cent. depreciation on that sum is $630, which deducted from the value leaves $1470, which gives the value in the damaged state. The assured have

declared and stipulated by the policy that the cotton undamaged was worth to them $70 per bale, but being damaged it is worth thirty per cent. less. The thirty bales therefore were worth to them in New Orleans only $1470 instead of $2100. Now what will indemnify them? The amount of the depreciation with the expenses which accrued in saving the cotton from the wreck, of course. The cotton being worth to them in New Orleans $1470, add to that sum the amount of depreciation, $630 and the money expended in saving the cotton, and the assured is precisely in the same situation that he was when he started on the adventure. The damaged cotton may not in reality have been worth that sum to them, and yet they cannot complain, because that was its relative or comparative value resulting from their own standard, the valuation in the policy.

Now let us see whether this appraisement of the brokers, was the best mode of arriving at the damage. We think it was. There can be no better way of ascertaining the value of an article, than from the opinions of those who are well acquainted with it, and whose daily business is to deal in it. The broker is a habitual, or, if I may use the term, professional cotton dealer. His habits, experience and occupation, qualify him to judge truly of the value of cotton. His opinion, especially under oath, as it was in this instance, may be safely adopted as a criterion of value. This must also be the best mode of ascertaining the injury, because it produces the greatest certainty in the result, by the greatest simplicity in calculation. The brokers said that the lot above mentioned was damaged thirty per cent.; thirty per cent. on a given value or sum is mathematical certainty. To apply the language of Lord Mansfield, in Lewis *v.* Rucker; he says, "so likewise, if part of a cargo, capable of a several and distinct valuation at the outset, be totally lost, as if there be 100 hogsheads of sugar, and 10 happen to be lost, the insurer must pay the prime cost of those 10 hogsheads, without any regard to the price for which the other 90 may be sold. But where an entire individual, as one hogshead happens to be spoiled, no measure can be taken from the prime cost, to ascertain the quantity of such damage; but if you can ascertain whether it be a 3rd, 4th, or 5th worse, the damage is fixed to a mathematical certainty." The brokers have ascertained the

very thing which Lord Mansfield said would produce this certainty.

But their award is not alone recommended to us from the simplicity and ease by which it shows the true conclusion: it must be remembered that it was the first plan the plaintiffs below took to ascertain their injury, and the first and only evidence presented to the company under the condition in the policy, which requires notice and adjustment sixty days before the money was payable. It was moreover proven to be correct at the trial, and the customary mode of estimating the damage.

The insured, however, not content with this appraisement, proceeded to sell the cotton at auction, and offer the amount of the sale as the evidence of the value. An account was presented to the company sixty days before suit brought, in which they are charged with the damaged cotton at $70 per bale and all charges, and credited by the nett proceeds of the sale. To hold them liable by this rule would be to make them insure the market. For example, the thirty bales already mentioned were damaged only thirty per cent. and sold for $31 per bale; if the insurer is bound to pay for them at seventy dollars, he makes up more than the injury. The price for which it sold does not show how much it has been depreciated by the damage, and that is all the insurer engaged to make good.

In addition to this they offered evidence of the price of good cotton shortly before and after the sale, with a view to claim, I suppose, the difference; but the difference still affords no criterion, unless it be to fix a proportion of the difference between the sound and damaged cotton, according to the rule in Lewis *v.* Rucker. But that rule, although it might lead to a correct result, if the sale had been properly made and the price properly proven, is still more objectionable than to take the award of the brokers; because it is more uncertain. To arrive at the proper conclusion the amount of the sale has to be proven, and then the value of the sound article. The proportion is then to be taken with reference to the value in the policy. In the case referred to, the defendant took the proportion of the difference between the sound and damaged article, and paid that proportion on the value specified in the policy. Although that was the rule adopted for arri-

ving at the injury, it was so from necessity.   The sugar had been sold without a per cent. valuation in consequence of the increasing damage.   It is not to be regarded therefore as furnishing an authority against the efficacy of an appraisement by competent persons.   That mode of arriving at the injury embraces two distinct facts, from which two calculations are to be made.   1. The price the article sold for, then the value of the undamaged article, and then the proportion which the price at sale bears to the value of the article undamaged, is equal to the proportion which the quantity of injury bears to the insured price.   All this has to be done for the purpose of arriving at the per cent. damage.   It is better to be able to arrive at a conclusion by proof of a single fact than by proof of many.   As facts are multipled complexity is increased.   This produced the difficulty in the case of Lewis *v.* Rucker.

But there are other reasons for excluding the sale.   Auction sales are not always the best evidence of value, and it was also incompatible with the first evidence furnished the company as to the amount of injury.   Nor was it necessary to sell for any purpose.   In a case reported in 1 Caine's Rep. 49, the damage was estimated by the captain and prize-master; the insured afterwards sold at auction, and it was held that the sale was unnecessary for the purpose of ascertaining the value of the goods, and that therefore all the expenses of the sale should fall on the insured.   S. B. & Co. had not abandoned to the insurers, nor could they have done so, the loss being only partial.   The cotton was therefore theirs, and the sale must be considered as theirs, and the insurers are not liable for any of the expenses attending it.   It cannot be considered as a sale for the benefit of the underwriters, for such sales can only take place when a vessel is forced to stop short of the port of destination, and it becomes necessary to sell to prevent further deterioration in the value of the goods insured; in which case the principle of abandonment is assumed and acted on.   But when there is only a partial loss, and the goods arrive at the port of destination, they cannot be sold by the insured for the benefit of the insurer.   In all average losses, whatever is saved is for the benefit of the insured, and not for the insurer.— See Average and Marine Insurance, 284—5, and notes 1 and 2. 4 Taunton, 303.

[Natchez Insurance Company *v.* Buckner *et al.*]

From this view of the subject, it must follow that the testimony of Cenas, the auctioneer, in regard to the sale of the cotton, was improperly admitted. It is equally clear that the testimony of Poor, in relation to the ruling prices of cotton, the sales by Buckner, Stanton & Co. and the quality of particular brands, was also improper. So far as it goes to show that the cotton of the plaintiffs was damaged by the wreck of the boat, it was proper; that was a material fact. I differ with the counsel, however, in regard to the testimony of Ferriday, who was one of the appraisers. He must have been introduced to support and not to defend the appraisement. At all events, his answers have that effect, and considered in that light the testimony was proper.

We think the testimony of Henry was properly ruled out. The object seems to have been to prove that the plaintiffs had no interest in the cotton. *That* the defendants had admitted by the written agreement, and they were thereby estopped from denying it.

As regards the charges for which the insurers are liable, they are only the extraordinary charges which happened in consequence of the wreck. All the ordinary charges incident to the transportation of cotton to New Orleans, constituted a part of the insurable interest, and in an open policy, would be a part of the prime cost, and the subject of recovery, but in a valued policy they are supposed to be covered by the valuation, that being the criterion of the insured interest.

From what has been said, it will appear that the extent of the right to recover can be certainly ascertained thus: value the damaged cotton at $70 per bale; charge the defendants with the amount of injury or per cent. damage, as ascertained by the brokers; add the necessary charges which arose in consequence of the wreck; deduct the 2 per cent. agreed in the policy to be abated, and all off-setts proved, and you have the true amount.

The verdict greatly exceeds that sum, and must therefore be set aside. We have not noticed the errors assigned in detail, but they are all covered by the points settled, except the objection that the verdict does not cover the issues, and as the case will have to go to another trial, that point is immaterial.

The judgment must be reversed, the cause remanded, and a *venire de novo* awarded.