## THE LAMAR INSURANCE COMPANY OF NEW YORK

· *v.*

## JOHN ˙McGLASHEN *et al.*

1. MEASURE OF DAMAGES—*under a contract of insurance—as to the character of funds in which the loss was payable.* Where, by the terms of a contract of insurance upon a cargo of corn shipped from Chicago to Montreal, the loss, if any, was payable to the Bank of Montreal, in funds current in the city of New York, it was *held*, that in estimating the liability of the insurers, a loss occurring, the premium upon gold should not be allowed in favor of the assured.

2. SAME—*in respect to the value of the property insured.* Under a policy of marine insurance, which fixes the value of the goods at the sum insured, in case of a partial loss, as where the property insured was grain, a portion of which reached the port of destination in a damaged condition, the actual loss sustained by the assured, as shown by the difference in the market price of sound grain, and the market price of the damaged grain, is not the true measure of the liability of the insurer.

3. In such case, it is proper to inquire as to the difference between the market value, at the port of delivery, of grain in a sound condition, and the grain which has received damage against which it was insured, not, however, with the view to ascertain the *direct amount* of loss incurred by the assured, but to find the *proportionate* loss, that is, whether the difference between the sound and damaged grain was one-half, one-fourth, or one-tenth, etc. When this proportion of the loss is thus ascertained, the extent of the liability of the insurer is also ascertained, as he pays the same proportional part.

4. The standard of the liability of the insurer in such case, however, the value of the goods insured being fixed in the policy, is the value so fixed, and not the value in the market, so that when the proportion of loss is ascertained by the difference between the sound and damaged sales, that gives the aliquot part of the original value, which may be considered as destroyed by the perils insured against; and by applying this liquidated proportion of the loss to the standard of value as fixed in the policy, it gives the proportion of loss, whatever it may be, in terms of money. That gives the precise amount for which the insurer is liable.

5. SAME—*what charges and expenses will be regarded a part of the loss.* The charges and expenses incurred in handling and disposing of the goods, in case of a partial loss, in order to be considered a part of the loss, must be reasonable and proper, for the purpose only of ascertaining the amount of the loss.

33—54TH ILL.

6.   So items for surveys, inspection and sale at auction, may, in such case, be properly chargeable as a part of the loss, those being the appropriate means by which to ascertain the extent of the loss.

7.   But storage of the goods not being necessary for such purpose, charges on that account would not be regarded as a part of the loss for which the insurer would be liable.

8.   Nor would the amount paid by the consignee for insurance of the goods while thus in store at the place of delivery, be considered a part of the loss occasioned by sea damage.

APPEAL from the Superior Court of Chicago; the Hon. WILLIAM A. PORTER, Judge, presiding.

The opinion of the court contains a statement of the case.

Messrs. SCAMMON, McCAGG & FULLER, and Mr. LAWRENCE PROUDFOOT, for the appellants, cited 2 Parsons on Marine Ins. 399 to 402; 3 Kent, 430 to 432; 2 Arnould on Ins. sec. 3, 968; Stevens & Benneck on Averages, 292–4, as laying down the correct rule for computing damages in case of partial loss under a policy of marine insurance.

The rule is founded on three celebrated decisions—*Lewis* v. *Rucker*, 2 Burrows, 1167; *Usher* v. *Noble*, 12 East, 639, and *Johnson* v. *Shedden*, 2 East, 581. These cases establish the rule for adjusting partial losses on goods subjected to marine risks, which has been in force ever since the times of those decisions. That rule holds, that it is the proceeds of the gross sales of the sound and damaged goods, which are to be compared in estimating the damages under a partial loss. This would, of course, exclude the expenses of storing, insuring and handling the property insured. It also allows the assured to recover only a sum, less than the total damage to the goods, which is proportioned to the amount insured by the underwriters and the shippers.

Messrs RAE & MITCHELL, and Messrs. HERVEY, ANTHONY & GALT, for the appellees.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

This was an action of assumpsit, brought by appellees against appellants, upon a contract of marine insurance, bearing date the first of May, A. D. 1866, whereby appellants insured, under policy No. 155, for account of appellees, $15,000, on 20,981.18 bushels of corn, valued at the sum insured, on board of the bark Mary Merritt, from Chicago to Montreal. Loss, if any, payable to the Bank of Montreal, in funds current in the city of New York, with permission to trans-ship at Kingston, on standard barges or vessels. Premium of insurance, $285.60, acknowledged to have been received by the agents of appellants. The policy referred to provides that the beginning of the adventure shall be from and after the lading thereof, and continue until landed at the port of destination; but not to exceed forty-eight hours after the arrival and anchorage or mooring of said vessel at the port of destination aforesaid.

The bark left the port of Chicago on the thirtieth of April, 1866; but, in consequence of a severe storm, she was obliged to return about the third of May. After a survey, and with the consent of appellants' agent, she proceeded again. In the course of the voyage, the water got in, and when she arrived at Kingston, about the twentieth, it was found that four hundred bushels had become so wet and damaged as to require an immediate sale. The residue was receipted in apparent good order, trans-shipped upon a barge and taken to Montreal, arriving there on the twenty-eighth or twenty-ninth of May. On the thirtieth, it was inspected by an authorized inspector, and declared rejected. It is an undisputed fact, that it was then in a heated or heating condition. It was under the care of the consignees, but permitted to lie in the vessel some three or four days, and then put into store for the purpose of being handled and dried. Consignees obtained an insurance upon it, while in store, paying eighteen dollars as premium. A few days before the fourth of July, 1866, one thousand bushels of it were sold at private sale, at fifty-six cents, and on the fourth,

516          LAMAR INS. CO. *v.* McGLASHEN *et al.*     [Sept. T.,

Opinion of the Court.

the residue was sold at auction, different lots bringing different prices. These being the main facts, it is now necessary to determine, whether the proper measure of appellants' liability was regarded upon the trial. Appellees' statement of account between them and appellants, sufficiently shows what that measure was. It was arrived at in this manner: The market price of sound corn, at Montreal, at the date of arrival of cargo, was estimated at fifty-six cents per bushel. Appellees find what the whole cargo would have amounted to at that price. They then deduct from that amount the net proceeds of all the corn sold at the times and in the manner above stated; but, in arriving at the net proceeds of the latter, they deduct $1106.96 as the charges for handling it, and among the items making up that amount, is the eighteen dollars paid for insurance on it while in store (although the risk of appellants did not extend beyond forty-eight hours after its arrival at Montreal) and $823.77 for storage and drying; and, after all these deductions, the balance claimed to be due appellees, according to their own statement, was $3742.96. The jury, having no other data, found a verdict for $6022.29, and the court below refused to set it aside and grant a new trial. We have been unable, after the most careful examination of the testimony, to resort to any proper calculation by which the amount of this verdict can be sustained, and no theory has been suggested by which it can be sustained. Appellees prefixed to the amount of balance due, according to their statement given in evidence, the word "gold," and it has been suggested, that the jury must have allowed the premium on gold in 1866. If so, it was wrong, because, by the terms of the policy, the amount insured is payable in funds current in the city of New York.

It is apparent that an incorrect measure of appellants' liability was adopted at the trial. The basis of the verdict was, the difference between the market price of the sound, and the market price of the damaged corn, including all the particular charges above mentioned. That difference may give the amount

of appellees' loss, but it is not the amount appellants are liable to pay, because, first, it would make the market price of the corn the basis of the appellants' liability, when the true basis is the valuation in the policy; and it would involve the insurer in the rise and fall of the markets, with which he has no concern. The extent of loss the appellees sustained on this corn, by sea damage, is one thing, and the amount which the insurance company is bound to pay, is quite another; accordingly when the corn arrived at the port of destination, sea damaged, two points were to be ascertained: first, the extent of depreciation in value which it had suffered; second, the amount which the insurer ought to pay in respect thereof. The first point could be ascertained by simply comparing the price for which the corn would have sold in the market, had it arrived there sound, with the price for which it might have sold, arriving there damaged. But the object of comparing the proceeds of the sound and damaged sales, for the purpose of indemnity under the policy, is not to ascertain the *direct amount* of the appellees' loss, but its *relative amount*—the proportion which it bears to the price at which the corn would have sold, if sound; the question being, not whether the depreciation amounts to any *fixed* sum, but whether it amounts to one-half, one-third, or two-thirds, or any other proportion of the sum for which the corn would have sold, if sound; whether, in short, the property was one-half, one third, or two-thirds the worse for the sea damage. When this is ascertained, the liability of the insurance company is ascertained also, for they pay the same proportional part.

The corn in question was valued in the policy. It was not claimed that there was more than a partial loss. The mode of measuring the liability of the insurer in such case, is laid down in the leading case of *Lewis* v. *Rucker*, 2 Burr. 1167, by Lord MANSFIELD: "Where," said he, " an entire individual, as one hogshead, happens to be *spoiled*, no measure can be taken from the prime cost, to ascertain the quantum of damage; but if you can fix whether it be a third, a fourth or a

fifth worse, the damage is fixed to a mathematical certainty."
And this, he says, " is to be done by the price at the port of
delivery."

In *Usher* v. *Noble*, 12 East, 647, Lord ELLENBOROUGH stated
the rule thus: " The difference between the sound and dam-
aged sales affords the proportion of loss in any given case, i. e.
it gives the aliquot part of the original value, which may be
considered as destroyed by the perils insured against; when
this is ascertained, it only remains to apply this liquidated pro-
portion of the loss to the standard by which the value, as
between the assured and the underwriter, is calculated (i. e.
·the prime cost or value in the policy) and you have the one-
half, the one-fourth, or the one-tenth of the loss, in terms of
money."

The rule by which to calculate a partial loss, in such a case
as this at bar, is the difference between the respective *gross*
proceeds of the same article when sound and when damaged,
and not the *net* proceeds. *Johnson* v. *Shedden*, 2 East R. 581,
which case decides that the underwriter is not to bear any loss
from fluctuation of markets, or port duties, or charges after the
arrival of the goods at their port of destination. It is said in
2 Arnould on Ins. 969, that, " by the *gross* produce of the sale,
is meant the market price at which the merchant, after paying
freight, duty and landing charges, can sell the goods to the
consumer or purchaser at the port of arrival," and that, " by
the term *net* proceeds, is meant the gross proceeds, *deducting
freight, duty and landing charges.*" Ib. 970.

It is claimed by appellants' counsel, that the charges for
handling this cargo, after its arrival, were such as could not
be included in the amount of indemnity which appellants are
liable to pay. There are charges of a certain class which are
to be borne by the underwriter, though not a part nor a direct
consequence of the sea damage. Sales by auction are resorted
to mainly, with the view of comparing the sound and damaged
values, so as to ascertain the amount of indemnity which the

insurer has to pay. There may be other modes. The question, in all such cases, is, was that expense reasonable and proper, for the purpose of ascertaining the amount of the loss? If it be, then it is a part of the loss. In *Muir* v. *United Ins. Co.* 1 Caine's R. 49, the court said: "Had the sale at auction been to ascertain the injury the cargo had received, and limited to such parts as were damaged, it would have been a reasonable charge, but that appears not to have been the object or effect of the auction," and it was there held, that the charges attending the auction could not, for that reason, be considered as a loss to be borne by the underwriters. 2 Parsons on Mar. Ins. 399; 2 Arnould, 973. The principle being, that the charges, in order to be considered a part of the loss, must be reasonable and proper, for the purpose of ascertaining the amount of the loss; the inquiry as to a particular charge being of that character, might involve questions of fact, but when the facts are undisputed, it is the duty of the court to determine whether such extra charges were necessary to ascertain the partial loss, and, therefore, formed a part of it.

That the amount paid for insurance, while retaining this corn in store, was not reasonable or proper, is quite clear, and, under the rules laid down as to the mode of ascertaining the quantum of damage, there can be no reason shown to support the charge for storage. The quantum of injury should be ascertained immediately, or within a reasonable time. The storage was not for that purpose, but for the purpose of securing a rising market. The condition of the grain, for all the practical purposes of a public sale, could have been ascertained by inspection or survey.

If it was stored for the purpose of a more advantageous market, or any purpose other than that of a reasonable and proper mode of ascertaining the extent of the injury, the appellants would not be liable to that expense as a part of the loss. For the legitimate object of determining the extent of injury, it was immaterial whether the market, at the time of arrival, was rising or falling. Lord MANSFIELD, in *Lewis* v. *Rucker,*

*supra,* said : " Whether the price there (the port of delivery) be high or low, in either case it *equally* shows whether the damaged goods are a third, a fourth or a fifth worse than if they had come sound."

The items for surveys, inspection and sale at auction, may, under the circumstances above indicated, be properly chargeable as a part of the loss.

The court below having, by instructions to the jury, sanctioned a measure of liability on the part of appellants, different from that above enunciated, the judgment must be reversed and the cause remanded.

*Judgment reversed.*