## The Fern Holme.

### Bowring *v.* Providence Washington Ins. Co.

#### (*District Court, S. D. New York.* May 29, 1891.)

MARINE INSURANCE—VALUED POLICY ON HULL—MANAGING OWNER—INSURANCE ON ADVANCES—INSURABLE INTEREST.

Respondents issued a 12-months policy for $5,000 on hull and boiler of the steamship F., valued at $100,000. Twenty-two other companies issued other policies of like tenor, making in all $100,000 insurance. The managing owners being under advances for upwards of £6,000, owed to them by the ship's owners in the ship's business, took out at Lloyds, for the joint benefit of all the owners, three additional policies "on advances" for £5,750, as the probable average for the year. The ship was totally lost, and, all the policies having been paid in full except that of the respondents, making upwards of $100,000 paid in all, the latter resisted payment, on the ground that the libelants were estopped by the valued policy from recovering more than the agreed value of the ship. It appeared that the entire insurance was not in excess of the actual value of the ship. *Held*, (1) that the managing owners in possession had an equitable, if not a maritime, lien on the ship, and an insurable interest in the ship, and in her continued life, in respect to her advances; (2) that this interest was a different subject-matter of insurance from the policies on hull and machinery; (3) that the intent of the policies "on advances," and of the payment of them, was to insure that different interest, and that the amount paid thereon by the underwriters could not be offset by the respondents as a defense.

At Law.

*Convers & Kirlin*, for libelant.

*Wing, Shoudy & Putnam*, for respondents.

BROWN, J. On the 16th of February, 1888, the defendant issued a marine policy of insurance upon the steam-ship Fern Holme, insuring her for one year from February 20, 1888, in the sum of $5,000, on ac-

count of whom it may concern, the hull, etc., being valued at $75,000, and the machinery, etc., at $25,000. On the 9th of July, 1888, she was wrecked on the coast of Newfoundland, and became a total loss. Twenty-three other companies and associations had insured the hull and machinery upon the same valuation, making in all £20,000 insurance on hull and machinery, all of which, save the respondents' policy, has been paid. The respondents resist payment on the ground that the libelants effected additional insurance upon their interest in the vessel, upon which they have already recovered in all upwards of $100,000, whereby the full agreed value of the hull and machinery, it is said, has been made good to them; that, under the name of "advances," the libelants insured their same interest as owners with other underwriters, and received thereon upwards of $27,000, whereby they had overinsured their interest in the steamer, and had been already paid in excess of its agreed value; and that the respondents had tendered back to the libelants the premium paid on the policy in suit, which tender was refused. It is not denied that in an action on a valued policy the defendant may show in defense that the insured has already received the agreed value stated in the policy sued on from other insurers of the same identical interest. *Bruce* v. *Jones*, 1 Hurl. & C. 769; *Griswold* v. *Insurance Co.*, 3 Blatchf. 231; *Howard* v. *Scribner*, 5 Hill, 298; *Insurance Ass'n* v. *Armstrong*, L. R. 5 Q. B. 244. The policies on advances above referred to were effected at Lloyds,—one for £2,600, February 17, 1888, a second for £1,500 on the same date, and a third for £1,650 on February 20th. Each of these policies was procured by Hine Bros., as managing owners of the ship, and for the benefit of all the owners. They ran for 12 months from February 20, 1888, and were all in the following form:

"Upon any kinds of goods and merchandises, and also upon the body, tackle, apparel, ordinance, munition, artillery, boat, and other furniture, of and in the good ship or vessel called the 'Fern Holme,' (s.,) whereof is master under God for this present voyage * * *, or whosoever else shall go for master in the said ship, or by whatsoever other name or names the same ship or the master thereof is or shall be named or called, beginning the adventure, upon the said goods and merchandises, from the loading thereof on board the said ship, * * * upon the said ship, * * * and shall so continue and endure, during her abode there upon the said ship. And, further, until the said ship, with all her ordnance, tackle, apparel, and goods and merchandises whatsoever, shall be arrived at * * *, upon the said ship, until she hath moored at anchor twenty-four hours in good safety, and upon the goods and merchandise until the same shall be there discharged and safely landed. And it shall be lawful for the said ship, in this voyage, to proceed and sail to, and touch and stay at, any ports or places whatsoever, * * * without prejudice to this insurance. The said ship, goods and merchandises, for so much as concerns the assured by agreement between the assured and assurers in this policy, are and shall be valued at [the foregoing being in printed form, and the following in writing] £2,600 *on advances, being only against the risk of total loss of the vessel, constructive or otherwise.*"

A memorandum attached to the policies provided that in the event of loss the policies should be deemed sufficient proof of interest. The ag-

ᵤregate of these three valued policies on advances was £5,750. Hine Bros., as managing owners, transacted the business of the ship, and kept with her a running account, in which the amounts due them fluctuated largely from time to time. At the time the policies on advances were effected, the amount owing Hine Bros. for advances was £6,791. 11s. 10d.; at the time of the loss £3,346. 3s. 8d. Mr. Hine deposed that the "sum of £5,750 was insured on the assumption that that figure would about average the advances risked over the 12 months." He further stated that the value of the steam-ship was £25,000, and that the ship-owners always had a risk considerably greater than the insurance effected. "The advances," he says, "were not made subject to marine risks, but were to be repaid by the part owners in any event;" but, "as the vessel was not fully insured on her hull, machinery, etc., my firm, as managing owners, determined to cover a line on advances, so that these moneys would not be entirely lost to them should the vessel be lost by marine risk. On a sale of the steam-ship, the amount of said advances would be deducted from the proceeds before distribution among the owners." Besides the above insurance, there was one other policy on freight for 12 months, valued at £3,500. All these additional policies were paid before the commencement of this suit.

The evidence shows that the freight on the current voyage at the time of the loss, and the charter money for the return voyage, were greater than the valued freight insured. This is plainly a distinct subject, having nothing to do with the insurance of the hull and machinery, and need not be further considered.

The respondents contend that the policies "on advances" are, in legal effect, a further insurance on hull and machinery; that the subject insured and the interests are in reality precisely the same in the two classes of policies; and that the libelants are, therefore, estopped from making any further claim upon any of the insurers after they have received the full agreed value of the ship, viz., $100,000, which it is admitted the libelants have received. If, however, the subject of insurance is not the same in the two classes of policies, if the parties did not intend to insure the same identical interest, or if the payment "on advances" was not intended to be a payment on account of the hull and machinery insured in the other policies, then there is no ground for any such estoppel as is claimed, and the respondent can derive no advantage from the payments. *Burnand* v. *Rodocanachi*, L. R. 7 App. 333; *Howard* v. *Scribner*, *supra*.

1. On comparing the policies themselves, it is plain that the respondents' policy, and the others like it which make up the $100,000, are simply insurances upon the hull and machinery, which are valued in all alike at $75,000 and $25,000, respectively. The other three policies on advances, so called, although so incongruous in their reading as to go far to justify Mr. Justice BULLER's remark in *Brough* v. *Whitmore*, 4 Term R. 210, that a marine policy has "always been considered in courts of law as an absurd and incoherent instrument," do yet, by these very incongruities, and by their departure from the simple form of the other policies, strongly indicate that they did not contemplate insurance of

the same subject-matter as the former. The former insured the hull and machinery alone; the latter were upon "any kinds of goods, merchandises, and also upon the hull," etc.; but in the written portions stated to be "on advances." The valuation in the former is $100,000 on hull and machinery; in the three latter, £2,600, £1,500, and £1,650, respectively, "on advances." It is not credible that any of the parties supposed that they were valuing the ship and merchandise at these small sums. Construed in that way, moreover, the policies would be practically worthless, in view of the other insurance already effected on the hull for $100,000. Upon such incongruities in the forms of policies, the rule is to give greater weight to the written portions. Marsh. Ins. 248. The fair inference, I think, from these policies themselves, would therefore be that they were intended to insure valued advances to the amounts stated in connection with the business of the ship or her cargo during the year following; just as in the policy "on freight," precisely the same printed form is used, and the same mode adopted of stating the value of "ship and goods" as "3,500 pounds on freight, chartered or otherwise."

It is urged that Hine Bros. had no "advances" on the ship and goods in the legal and technical sense; that is to say, no lien upon them. This does not strictly appear on the proofs. But if the intent was to insure their actual advances, and the underwriters knew it, and paid accordingly, it is immaterial after payment whether there was any lien or not, or whether the policies were legally enforceable. If the policies were void, then surely the subject-matter was not the same as the respondents' policy, which is confessedly valid. If it was either a wager policy or a gift, the respondents cannot take any advantage from it. *Burnand* v. *Rodocanachi*, L. R. 7 App. 333. If the libelants had no ownership nor lien nor rights connected with the ship or goods in respect of their advances, they could not perhaps enforce a policy "on ship and goods" for lack of apt words showing an insurable interest, in the absence of some further stipulation. *Minturn* v. *Insurance Co.*, 2 Allen, 86; *Insurance Co.* v. *Baring*, 20 Wall. 159, 163; *Hancox* v. *Insurance Co.*, 3 Sum. 132. But no question of that kind arises here, because the policies themselves provided by a special memorandum that the issuing of the policy should be deemed sufficient proof of interest, and because Hine Bros. were in fact part owners, and because the insurers have paid the policies without raising any such question.

The inquiry, therefore, returns, what was the subject intended to be insured and paid for by the policies on advances? Upon this point I find nothing in the testimony to indicate that it was anything different from what it purports to be on the face of the policies, namely, the actual advances of Hine Bros. in the business of the ship. Whether these advances were a lien or not, they were a debt for which the owners were liable, and the loss of the ship would by so much diminish the available means of payment. In the business of the ship, moreover, Hine Bros. found their own business and their own profits, which by the loss of the ship would be *pro tanto* destroyed. The profits of the ship's bus-

iness also for the current year, which passed through their hands, would be a further security to Hine Bros. for their claims. Their advances, and their business relations with the ship, gave them, therefore, a specific interest in the life of the ship quite distinct from their part ownership in the hull and machinery. And all these interests to which the advances were attached, and on which they depended, were through apt words a proper subject of insurance, as much as freight, or profits, or commissions, or the life of a debtor in a life insurance policy in favor of a creditor; or a debt of ship-owners arising from their ship's negligent collision with another ship now usually insured against in marine policies. *Hancox* v. *Insurance Co.*, *supra; Wilson* v. *Jones*, L. R. 2 Exch. 139; *Hooper* v. *Robinson*, 98 U. S. 528. Whether the words chosen to express this intent were sufficient to withstand sharp legal criticism is now immaterial, since the policies have been paid. In my judgment, Hine Bros. being managing owners in possession, had such an equitable lien on ship, cargo, or freight, as the case might be, for their advances, even if they had no maritime lien, as to give them an insurable interest for such advances, which was covered by this policy, within the authority of the case last cited. Abb. Shipp. †107; Story, Partn. § 443. The intent both of the policy and of the payment is further made clear by Mr. Hine's testimony, where he says that, "as the vessel was not fully insured on hull and machinery, my firm, as managing owners, determined to cover a line on advances, so that those moneys would not be entirely lost to them should the vessel be lost by a marine risk." It thus appears that, though the reason they effected the insurance on advances was because the insurance on the hull was less than the ship's value, it was intended to insure the advances, as such, not the hull and machinery; so that if the ship were lost, the owners, by this additional insurance on advances, might be fully indemnified. The insurance of "advances," which the owners would in any event be obliged to pay, operated indirectly to their benefit, by extinguishing their debt *pro tanto*, as much as further insurance of hull and machinery would have done. But this circumstance does not make the two modes of insurance identical, or the subject-matter in fact the same. If the additional insurance had been upon the hull and machinery, it might have been unavailing and worthless. The intention was no doubt to cover what was not covered in the prior policies, but the intent was to cover it by means of insurance on advances only. This method of insurance seems to have long been in common use at Lloyds. Mr. Hine deposed that he had been for the past 30 years a marine insurance agent; that for 13 years he personally conducted such business at Liverpool, as well as at Maryport; and that during his whole experience, which was a large one, he never knew until the present instance of any case where the question was raised as to insurance on hull and machinery having anything whatever to do with insurance effected on advances, with the "policy-proof-of-interest" clause in the policy; and that "it is an acknowledged custom in England for such advances to be made by managing owners of steamships, and to have such advances covered by insurance, as was done in

the present case, and such policies are never considered in any way to affect policies on hull and machinery." It was competent for Hine Bros., as managing owners in possession, to insure this debt. On payment by the underwriters, the money went primarily to pay Hine Bros. Incidentally, it inured equally to the benefit of the other part owners. So long as such policies are not taken out in excess of the actual value of the ship, there is no interest liable to be injuriously affected by them, nor do they violate any general public policy. Had Hine Bros. effected these policies for their own interest only, as creditors, it would hardly be contended that the respondents could have any benefit from them, though the underwriters, who paid the advances, might be subrogated *pro tanto* as creditors of the other part owners for the payment of their share of the debt. How is the case altered by the fact, which appears in the testimony of Mr. Hine, that the insurance was designed indirectly for the benefit of all the part owners, through an extinguishment of their debt *pro tanto*, so as to prevent any equitable subrogation? That in no way concerns the respondents. Had the policies not been valued, possibly the amount recoverable on them by Hine Bros. might have been reduced to the proportion actually owed them by the other part owners; but after payment this again is immaterial.

The case differs essentially from that of money raised upon bottomry of the ship after the insurance is effected, for in that case there is, in legal effect, a transfer of a part interest in the vessel to the bottomry creditor; and the owners, through the receipt of advances on bottomry, which is a species of insurance, receive a part of the value of the vessel, which in case of loss they are not liable to repay. In such a case, therefore, the bottomry operates as an actual diminution by so much of the owners' interest in the vessel. For that reason, such subsequent advances on bottomry are deducted from previous valued insurance on the ship, though prior bottomry is not deducted. *Watson* v. *Insurance Co.*, 3 Wash. C. C. 1. In the present case the facts are otherwise. There was no diminution of the owners' interest at any time. The advances that were insured the owners were bound to pay, whether the vessel was lost or not. The subsequent policy on advances made no change in the relation of the owners to the respondents, or as respects the libelants' interest in the hull and machinery which the respondents insured. The advances were a debt really owed to Hine Bros. This debt belonged to the business of the ship, and was so intimately connected with the ship and her future life and earnings as to be a proper subject of insurance. It was this that the policy on advances was designed to insure, and for which the payment was made by the underwriters; and, as this violated no policy of the law through any excess in amount, worked no injury to the defendants, and was designed to operate primarily as an extinguishment of a debt to Hine Bros., it was, in my judgment, wholly independent of the subject-matter of the respondents' policy, and constitutes no defense to this libel. Decree for libelant, with costs.