INTERNATIONAL NAV. CO. v. ATLANTIC MUT. INS. CO. SAME v. BRITISH & FOREIGN MARINE INS. CO. SAME v. THAMES & MERSEY MARINE INS. CO. SAME v. INSURANCE CO. OF NORTH AMERICA. SAME v. BROWN et al.

(District Court, S. D. New York. March 15, 1900.)

1. MARINE INSURANCE—VALUED POLICIES ON SHIP—UNDERVALUATION — PARTIAL LOSS.

Upon a partial loss on valued policy on ship, the cost of repairs when made (less the ordinary deduction of new for old) is the measure of indemnity against the insurers, each insurer being liable for that proportion of the amount of its insurance which the cost of repair bears to the policy value, and not, as in a valued policy on goods, the proportion which the loss bears to the actual sound value at the port of discharge.

2. SAME—SALVAGE—GENERAL AVERAGE—DAMAGE AND EXPENDITURES— NEW YORK RULE.

In such case, where in consequence of stranding, necessary salvage expenses are incurred for the rescue of ship, cargo and freight including direct injury to the ship in the salvage operations, insurers are liable to the assured in the first instance, independently of any general average adjustment, for the direct injury to the ship; and on payment they are subrogated to any rights of the assured to a general average contribution on freight and cargo for their share of that loss; and semble, by the law of this country, the same rule applies as respects the recovery in the first instance of salvage expenditures necessary for the rescue of the ship, though freight and cargo are thereby benefited; and by the New York rule, the amount of the recovery for such damage to the ship, and such expenditures, is not to be reduced in the proportion of the undervaluation in the policy.

3. SAME—INSURANCE ON "DISBURSEMENTS."

A policy on "disbursements" intended to cover a variety of subjects connected with the use and service of the ship, as well as any interest in the ship not covered by insurance, and being against total loss only, is not "simultaneous" insurance of the same date and "on the same premises," when the date of the policy is different, though operative from the same day, the risk, subject-matter and conditions being different.

**4. SAME—FACTS STATED—ESTOPPEL.**

The steamer St. Paul, worth $2,100,000, was insured for about $1,-350,000 in numerous policies, in which she was valued at the latter sum; the steamer by stranding was thereby damaged in her hull, and in necessary salvage operations she was further damaged by the sanding of her engines, in all to the amount of $107,368.42; necessary salvage expenditures were paid by the shipowner as adjudged in two salvage suits, one against ship and freight for $131,148.05, and another against the cargo for $29,133.67, and also legal expenses to the amount of $5,071.64; no general average adjustment having been made, *held* (1) that all the salvage losses and expenditures were covered by the terms of the policies; .(2) that the damage to the hull from stranding was particular average, for the whole of which the insurers were responsible in the proportion of each policy to the policy valuation: (3) that though the other salvage losses and expenditures might be subjects of general average if the stranding were not brought about by negligence, a general average adjustment was not a condition precedent to the right of the assured to maintain actions upon the policies; (4) that the sanding was a loss and damage to the subject insured directly within the policies, for which the insurers were liable to the assured in the first instance, with subrogation on payment to any right of the assured to a contribution in general average from the cargo; (5) that the adjudications adjudging the amount of salvage expenses to be paid by the ship and freight on the one hand, and the cargo on the other, were binding on the parties interested; and that the assured was entitled to recover the amount adjudged against ship and freight from the insurers less its own proportionate share as owner of the freight interest to be adjusted on a reference, if not agreed upon, and that the same rule applied to the legal expenses in the action against ship and freight; (6) that the claim against the insurers for the salvage charges as adjudged, should not be reduced by reason of the undervaluation of the ship in the policies to the extent of one-third below her true value which was also the basis, in part, of the salvage award, the insurers being estopped by the valuation fixed in the policy from raising that question.

(Syllabus by the Court.)

In Admiralty. Marine insurance. Stranding. Valued policies. Partial loss.

Robinson, Biddle & Ward, for libelant.

Carter & Ledyard, Lewis Cass Ledyard, and W. F. Taylor, for Atlantic Mut. Ins. Co.

Evarts, Choate & Beaman, Treadwell Cleveland, Wm. V. Rowe, and Pratt A. Brown, for the other insurers.

BROWN, District Judge. The above libels were filed to recover upon divers insurance policies for the damage and expenses to the steamship St. Paul, caused by her stranding on the Jersey coast near Long Branch in dense fog during the night of January 24, 1896. There were numerous policies, all valued, some English and some American, mostly in similar form, and insuring the steamship in various sums, amounting in all to the valued sum of £275,000, i. e. about $1,350,000; viz. $755,625 on hull, $487,500 on machinery, and $97,500 on cabin furniture, etc. The steamer's actual value before stranding, as admitted on this hearing, was $2,100,000.

The items of loss and expense caused by the stranding of which a pro rata proportion is claimed of the several defendant companies, are the amounts which the libelant has paid.

1. For salvage and interest....................................... $135,937 22
2. For legal expenses............................................    5,071 64
3. For repairs and attendant expenses..........................  107,368 42
                                                                 _____
   In all....................................................... $248,377 28

The item for "salvage" is based upon two judgments in this court on libels filed by the salvors against the St. Paul and her freight in one action, and against the libelant in personam, as carrier of the cargo, in a second action. In the first, the salvors were awarded against the ship and freight $131,148.05 (including $136.05 costs); and in the second as respects the cargo, the sum of $29,123.67 (including $136.15 costs). 82 Fed. 104. These awards were affirmed on appeal. 30 C. C. A. 70, 86 Fed. 340. As the policies here sued on insure the ship only, and not the freight, the amount here claimed for the salvage paid on account of the ship, is the arithmetical proportion of the judgment against ship and freight, apportioning it according to the respective valuations of ship and freight adopted by the court in its previous decisions; viz. $2,000,000 as the value of the ship, and $16,902 as the amount of freight.

The item claimed for "legal expenses" is for the expense of defending the salvage suit against the ship.

The claim for "repairs and attendant expenses" is: (a) For the damages to the ship's machinery by sanding, through the use of her engines and propeller during the salvage operations in getting the ship off the beach; and (b) for damages to the hull in the loosening of rivets through stranding.

On the hearing it was admitted that all the above items have been paid by the libelant on account of the stranding; and that all, except the damage to hull, would be proper subjects of a general average adjustment, but that no such adjustment has been had. The defendants contend that they are not liable for the full amount of these charges; but that (1) as the policies are valued policies and the ship therein valued at only about two-thirds her actual value, they are liable for only the same proportion, i. e. two-thirds of the losses and expenses, whether they are general or particular average; (2) that there are other policies on "disbursements" which should still further reduce their liability; and (3) that no action will lie against the insurers for any general average charges until after a general average adjustment has been had, and then only for the amounts adjusted.

The policies on "disbursements" are to the amount of about £125,000 insuring against total loss only; and there are also some other policies, termed "contingent insurance," to the amount of $121,875, against general average and contingent or collision damages; by the general average insurance it was designed to make good, as the policy states,

"The deficiency, if any, between the vessel's proportion of general average as per adjustment, and the proportion thereof due under policies on said vessel for £275,000."

This last insurance was designed to cover the uncertainty existing as respects the amount legally recoverable against the underwriters upon a general average adjustment when the policies, as in this case,

materially undervalue the ship. If the defendants are liable in full in this action, those policies will not become operative; they have no bearing therefore upon the decision of the questions here raised and will not be further referred to.

1. The policies upon "disbursements" were in addition to the regular policies on hull, etc., which insured the steamer up to her policy value, and they were operative from the same date though not dated the same day as the policy of the Atlantic Mutual Company, which provided that

"Other insurance upon the premises aforesaid, of date the same day as this policy, shall be deemed simultaneous herewith: and the said Atlantic Mutual Insurance Company shall not be liable for more than a ratable contribution in the proportion of the sum by them insured to the aggregate of such simultaneous insurance."

The policies of the other defendants contained no such clause

The evidence shows that policies upon "disbursements" are in very common use; that they are designed to cover a variety of interests not covered by policies in the ordinary form, including moneys which have gone into the construction of the hull and equipment and sunk in depreciation; the value of the contracts in the performance of which the ship may be engaged; any interest in the nature of the good will or profits of her business; any peculiar interest of the owner in the vessel irrespective of her actual value; and though not designed as an insurance on hull, would have the effect of covering any uninsured value of the vessel.

"Disbursement" policies are often issued where the hull is fully covered by other policies; they are against total loss only, and are deemed a different interest from a policy on hull, and in case of total loss have no benefit of salvage, such as ordinary policies have. All the other policies covered partial loss as well as total loss, excluding, however, loss below 5 per cent. in the Mutual, and 3 per cent. in the other policies.

I am of the opinion that the "disbursement" policies do not come within the clause of the Atlantic Mutual's policy above quoted, and were not designed or understood by either party to do so. The whole clause as well as the special words "upon the premises aforesaid," should be construed with reference to the well-known practice of insuring against a total loss only a variety of different interests under the name of "disbursements";—an interest so different, as to have no share in salvage on total constructive loss. The subjects, the losses, and the conditions in the two classes of policies are materially different. The description of the subject insured, namely, "disbursements," it cannot be doubted, was deliberately chosen to signify a wholly different risk from that upon "hull, machinery and equipment," and in order to distinguish the two as wholly different classes of insurance. Had the intention in the policies in suit been to require contribution from every kind of simultaneous policy that affected in any way any interest in the ship, it seems to me that different and more explicit language should and naturally would have been used to indicate that intention; such as, "any other policy affecting the ship or any interest therein," or some equivalent and clear indi-

cation of that intention. It does not seem credible that either party could have intended that the policies on disbursements, which exclude any liability for partial loss, and from which the assured, therefore, could not derive any benefit in case of a partial loss, should nevertheless be intended to be classed by that clause with the partial-loss policies and serve to reduce pro rata the liability upon those very policies by which the libelant had designed to insure itself against partial loss, and had paid a full premium for that indemnity. The language of the policy is, moreover, the language chosen by the insurers. In case of doubt it is not only to be construed against them, but it is further subject to the rule of construction that it must be understood in the sense in which the insurers knew that the assured understood or would naturally understand it. In law the term "premises" in an instrument is often used to refer to whatever precedes:

"That part in the beginning of a deed, consisting of all that precedes the habendum, including the date, the parties' names, and descriptions, the recitals (if any), the consideration and the receipt thereof, the grant, the description of the things granted and the exceptions, if any;" or in a bill,

"A statement of the facts and circumstances of the plaintiff's case, and the names of the persons against whom he seeks a redress, as well as the mere subject-matter, or thing granted, or described."

This provision of the Atlantic Company's policy should, I think, be held to refer only to other policies that are upon substantially the same risk, i. e. upon essentially the same subject-matter, and upon the same essential terms and conditions of the policy as well. As these "disbursement" policies are so wholly different from the others as to subject-matter, terms and risk, and do not cover partial loss, I am of the opinion that they should not be deemed within the language or intention of the provision quoted. The Fern Holme (D. C.) 46 Fed. 119; Insurance Co. v. Bowring, 1 C. C. A. 583, 50 Fed. 613. Literally, the date would also exclude them.

2. The defendants' contention that an adjustment in general average is a condition precedent to any action against the insurers, and that they are only liable for the amount therein assessed against the ship, has no application to the item claimed for the damage to the hull by the loosening of rivets, since this damage is particular average only, and could not possibly form any part of a general average adjustment.

For the other items claimed a general average adjustment might be made. But even if the defendants would be entitled after such an adjustment to deduct the amounts charged against freight and cargo, this would not make a prior adjustment in general average a condition precedent to the maintenance of these actions, but would only require the proper deductions to be made upon a reference to ascertain the amount due, as was done upon a similar objection in the case of Jumel v. Insurance Co., 7 Johns. 412. There the owner of the ship was also owner of the freight and cargo; and it was held that inasmuch as upon a full recovery by the plaintiff of the expenses incurred under the sue and labor clause, he would be bound at once to repay to the defendant, as insurer on ship alone, the amount of the contributory share chargeable against himself as owner of freight and cargo on the principles of general average, the proper deductions

should be ascertained and made by the referees appointed in the case. See, also, Greely v. Insurance Co., 9 Cush. 415, 419. The same course might be pursued here if the libelant owned both freight and cargo; but being the owner of the freight only, he should deduct the proportionate charge against that interest, so far as not already deducted; and the amount adjusted upon a reference, if not agreed upon. The proportion which would be chargeable to the freight is extremely small, being only about four-fifths of 1 per cent. of the amount chargeable against the ship; and for so small an interest no formal general average adjustment would be ordered, if it were not otherwise necessary; but that fraction would be otherwise computed.

Under the American law, however, the assured is under no obligation to enforce such partial remedies as he may have by means of a general average adjustment against third persons, for the benefit of the insurers, as respects a loss or expense directly covered by the policy; but he may look to the insurers, in the first instance, for the payment of the whole damage or expense, without deduction for prospective contributions that may be obtained from other persons equitably bound to pay a part of the loss, leaving those remedies, if any, to be pursued by the underwriters by subrogation to the rights of the assured. The defendants contend that this rule does not apply to salvage losses and expenses.

As above stated, however, the salvage expenses chargeable against the cargo have already been separated by the adjudication of this court and are not claimed in these libels; so that that proportion of these expenses has already been deducted; and the law expenses claimed were not in the cargo suit. Thus all that remains subject to the defendants' contention in this regard (the freight interest being disposed of as above), is the cost of repairing the damage to the steamer's machinery by sanding, which it is admitted would be a general average charge. This expense having never been apportioned, fairly presents the question whether or no the insurers are liable for the whole of it in the first instance, taking their remedy over by subrogation against the owners of other interests.

Considering that the house of lords has held in Aitchison v. Lohre, 4 App. Cas. 755, that salvage losses and expenses are directly within the contract of insurance against sea perils, and that the damage to the ship's machinery by sanding is a direct damage to the ship herself, the subject insured, and that this item of the libelant's claim is thus brought directly within the well-settled principle of Dickenson v. Jardine, L. R. 3 C. P. 639, to say nothing of the numerous older cases to the same effect in this country, I fail to perceive any force in the defendants' contention, or how the existence of a possible remedy for a part of this loss against other persons, can impair the libelant's right to recover its whole actual damage directly against the defendants, according to the terms and conditions of the insurance contract.

The above decisions alone, without reference to the American cases, seem to me on principle to dispose of the defendants' contention in this regard. But considering the practical importance of

the principle involved, the fact that by the practice of the English underwriters this principle, in the absence of express adjudication there, is not applied to general average expenditures (Lown. Ins. 207), and the natural desire of the foreign insurers to introduce that practice here, notwithstanding the earlier adjudications in this country to the contrary, and the elaborate argument of counsel, I add some further observations upon the reasons and the authorities in support of the American law on this subject.

(a) It is conceded that for a loss or damage directly to the subject insured, although it is occasioned by a general average sacrifice, such as a jettison of goods, the insurer may be directly called on to pay the assured his whole loss, taking by subrogation whatever rights the assured may have to contribution from other interests. This was held in the above-cited case of Dickenson v. Jardine, L. R. 3 C. P. 639, a case of jettison, where it is said that the assured

"Has two remedies, one for the whole value of the goods against the underwriters, and the other for a contribution in case the vessel arrives safely in port; and he may avail himself of which he pleases, though he cannot retain the proceeds of both so as to be repaid the whole of his loss twice over." Page 643.

And this is now the settled English rule as to any general average sacrifice of goods or of the ship. See The Knight of St. Michael [1898] Prob. 30–36; 2 Arn. Ins. (6th Ed.) 915, 916; McArthur, Ins. 134, 281; Gow, Ins. 312.

The same rule, however, was long before adjudged in the early decisions in this state, and has been ever since deemed to be the settled American law. 2 Pars. Mar. Ins. 289; 2 Phil. Ins. § 1348; Vandenheuvel v. Insurance Co., 1 Johns. 406; Maggrath v. Church, 1 Caines, 196, 215; Watson v. Insurance Co., 7 Johns. 57, 62; Faulkner v. Insurance Co., 2 McMul. 158; Potter v. Insurance Co., 4 Mason, 298, Fed. Cas. No. 11,336; Griswold v. Insurance Co., 3 Blatchf. 231, 238, 239, Fed. Cas. No. 5,840; Lord v. Insurance Co., 10 Gray, 109, 126; Thornton v. Insurance Co., 12 Me. 150.

No clearer exposition of the situation is to be found than in the early case of Maggrath v. Church, 1 Caines, 196, where some corn insured had been damaged through necessary cutting away of the vessel's masts, while she was on her beam ends; the court having held that the damage to the corn was a general average sacrifice, the question arose, said Kent, J. (page 215):

"Whether the totality of the contribution due to the plaintiffs for the loss of their corn is recoverable in the first instance from the insurer. We are of opinion that it is, because the loss arises wholly from a peril within the policy, and the plaintiff has a right to look for his indemnity from the person who has engaged to indemnify him from the peril. This argument appears conclusive. This will not lead to a multiplicity of suits any more than a different rule; for if the plaintiffs could recover only a contributory share from the defendant, they would be compelled to resort to the owner of the ship for the residue; and this suit over may as well be brought by the insurer as the plaintiffs, for one great object of insurance is, promptly to reinvest the assured with his capital, lost by the perils of the sea, and thereby enable him to continue his commercial enterprises."

The principle of all these cases is very simple, namely, that where the loss or damage claimed is a loss or damage to the subject in-

sured, and is a loss within the policy, the insurers are directly liable therefor, by force of the contract of insurance, and that they

"Cannot avail themselves by way of plea, of the fact that the assured has a distinct right against some other person. They must pay the amount claimed in the first instance, and will then be entitled to use the name of the assured and proceed against the other parties who are liable, as explained by Lord Wensleydale in Assurance Co. v. St. Louis, 7 Moore, P. C. 286, 316. Questions of this kind have arisen in many forms and always have been decided in the same way." Per Willes, J., in Dickenson v. Jardine, L. R. 3 C. P. 643, 644.

The same point was adjudged on full consideration by Shaw, C. J., in Hart v. Railroad Co., 13 Metc. (Mass.) 99. It is immaterial, therefore, as respects the liability of the insurer to the assured, whether the loss is a particular average loss, or a general average loss; or, if the latter, whether there has been any adjustment or not. If the assured is entitled to a general average adjustment and a consequent contribution from the cargo, the insurers may have the benefit of it afterwards.

But general average and insurance have no necessary connection. The rights and duties of the parties as regards a general average contribution, grew out of the law of the seas long anterior to the practice of insurance; and those rights and duties are the same, whether there is insurance on ship, freight or cargo, or no insurance at all. The obligations of the insurer, on the contrary, spring solely from his contract. These suits are brought to enforce such contracts; not to procure a general average adjustment, or to recover average contributions. It is immaterial, therefore, what rights might be enforced against third persons through general average proceedings. In a suit on the policy, if the loss or expense claimed has through sea perils fallen upon the ship to her "hurt, detriment or damage," the claim is within the policy, and the insurers, according to all the authorities, should be held to their direct obligation to pay it, without reference to any collateral remedies against other persons upon a general average adjustment.

The cases above cited are mostly cases of a jettison of goods, though some were for salvage and expenses. But it is manifest that the above principle is as applicable to a general average sacrifice of the ship, such as the cutting away of masts, or the sacrifice of any other part of the ship, or of her machinery, for the purposes of rescue from imminent danger, as it is applicable to a sacrifice of goods by jettison for the same purpose. See Griswold v. Insurance Co., 3 Blatchf. 231, Fed. Cas. No. 5,840; Potter v. Insurance Co., 4 Mason, 298, Fed. Cas. No. 11,336.

The sanding of the steamer's machinery by using her propeller in the efforts to get her off the beach during the salvage operation, was pro tanto a sacrifice of the ship arising through sea perils (Arn. Ins. [6th Ed.] 901; The Bona [1895] Prob. 125; York-Antwerp Rule 7, adopted in these policies); and being a direct damage to the thing insured, this is plainly within the above rule. Such is now the English practice. Gow, Ins. 312, 313. This, with the particular average to the hull, makes the whole of the third item claimed, for which the insurers are, therefore, directly liable, less the small allowance for

freight contribution chargeable against the libelant itself, as above stated.

(b) The item claimed for the legal expenses of defending the salvage suit against ship and freight, falls under the sue and labor clause of the policy; but being a mere incident of the salvage services, it should be treated in the same manner, so far as it is a proper charge, with a ratable deduction for the freight interest as above stated.

(c) As respects salvage or general average expenses incurred by the master or owners for the benefit of ship, freight and cargo, the American rule is doubtless the same as in cases of a jettison of goods or a sacrifice of the ship's material. 2 Pars. Mar. Ins. p. 289, c. 5, § 12. It was so held by Chief Justice Kent in Watson v. Insurance Co., 7 Johns. 57, 62, which has ever since been a leading case in American law. That was a case of expenses alone. See other cases above cited. This rule was approved by Lindley, J., in Dixon v. Whitworth, 4 C. P. Div. 378; and such was the judgment of the New York court of appeals as to salvage expenses in the recent case of Providence & S. S. S. Co. v. Phœnix Ins. Co., 89 N. Y. 559, even after a general average adjustment. See 22 Hun, 517.

Notwithstanding these decisions, a different rule, it is urged, ought to be applied to salvage expenses, because each interest benefited, it is said, should be deemed primarily charged by the master's or owner's engagement with its own proportion only. Some expressions to that effect are cited (Lown. Gen. Av. [3d Ed.] 231, 232; Lown. Ins. 207; Sir Gorell Barnes in The Mary Thomas [1894] Prob. 108, though that case was finally decided on wholly different grounds). But this is not quite accurate, for the master's contract may bind the ship for the whole (The Prinz Heinrich, 13 Prob. Div. 31); or through the ship's negligence (The Irrawaddy, 171 U. S. 189, 18 Sup. Ct. 831, 43 L. Ed. 130), or some other circumstances (Anderson v. Steamship Co., 10 App. Cas. 115), the cargo may not be liable to contribute at all, and the ship would thus be bound for the whole. And generally, as every maritime contract of the master binds the ship, the ship and owner would seem to be always in the first instance chargeable for the whole salvage services when it was engaged by the master or owner for the ship's benefit, though the freight and the cargo may be bound for the benefit to them also (see Sup. Ct. rule 19); and this liability of all would seem to remain until some separation or apportionment is made by act of the parties or by judicial decree. When all interests are liable, the court, if the proper parties are before it, will adjudge its due proportion against each (The Col. Adams [D. C.] 19 Fed. 795) and each will be thereby bound for its share (Stratton v. Jarvis, 8 Pet. 4, 10, 8 L. Ed. 846). Whatever the ship or owner is obliged to pay under such a decree, or whatever they may be otherwise forced to advance or pay under the circumstances of the case, in order to extricate the ship from peril, being a charge and lien upon the ship, is as much an appropriation of the ship pro tanto to the common safety, to her "hurt, detriment and damage," as the cutting away of her masts would be, or a jettison of goods for the same purpose. Arn. Ins. (6th Ed.) 791; Cullen v. Butler, 5 Maule & S. 461;

Davidson v. Burnand, L. R. 4 C. P. 117; Insurance Co. v. Hamilton, 12 App. Cas. 484, 498.

Suppose that a ship on her beam ends and in peril, is relieved in one case by a jettison of goods; in a second case, by cutting away her masts or by some other sacrifice of the ship's material; in a third, by employing another vessel to right her; plainly these are but different modes of accomplishing the same thing; they all stand in the same relation to general average, and should be treated in the same way as respects the insurer. There is no ground for distinguishing between them. In Kemp v. Halliday, 6 Best & S. 723, 747, Blackburn, J., says:

"It is immaterial whether the shipowner sacrifices a cable or an anchor to get the ship off the shoal, or pays the worth of it to hire those extra services which get her off."

This was approved in Anderson v. Steamship Co., 10 App. Cas. 115.

Although salvage expenses, moreover, were formerly regarded as only coming under the "sue and labor" clause of the policy, the house of lords in the case of Aitchison v. Lohre, 4 App. Cas. 755, above referred to, held them to be directly within the insurance against sea perils; although when the service has been engaged by the master or owner, it may be also within the sue and labor clause. So far, therefore, as they are a charge and a lien upon the ship, and thereby a "hurt, detriment and damage to her," the insurers by the very terms of the policy are directly answerable to the assured who has paid them.

As above observed, moreover, salvage expenses are not necessarily a general average charge. They are not so when made necessary, as not infrequently happens, by negligence in navigation. The Irrawaddy, 171 U. S. 189, 18 Sup. Ct. 831, 43 L. Ed. 130. Then they are in effect particular average, (though not so within the memorandum,— Price v. Insurance Ass'n, 22 Q. B. Div. 580) to be borne by the shipowner and hence by his insurer. For negligence in navigation is no defense to the insurer. These policies in fact insure against such negligence. To make a general average adjustment, or a reduction of the claim against the insurer by the amount of prospective general average contributions not collected by the assured, a condition of recovery on the policy, would often, therefore, prevent the assured from recovering a considerable part of his actual loss, though covered by the policy, by reason of negligent navigation alone; thus reversing both the express provisions of the policy and the well-settled rule of law as to negligence. This consideration alone would seem to be a sufficient reason for overruling the limitation contended for.

In the case of Watson v. Insurance Co., 7 Johns. 57, the objections here urged by the defendants were considered by Kent, C. J., and overruled. The expenses there claimed were incurred by the master in his endeavors to procure the release of the ship and cargo from capture. The captain, indeed, declared generally that "the expenses were incurred in the business of the ship"; meaning evidently that they were all incurred in the endeavor to get the ship released, though the freight and cargo were equally interested. For Chief Justice Kent expressly states that the expenses were incurred for the bene-

fit of the cargo, as well as for the ship and freight; he says (pages 61, 62):

"The eleven first items arose before the captain ceased to have charge of the cargo, and were therefore incurred in laboring for the benefit of the cargo as well as for the ship and freight. All these subjects of insurance were equally involved in the peril. * * * The labor and expense were incurred for the recovery of the ship, notwithstanding that other subjects might incidentally enjoy the result of the effort. The plaintiff was obliged to pay and bear the charges as owner of the ship; and * * * he is entitled, even if a case for contribution existed, to recover the whole of it in the first instance of the insurer upon the ship, and to leave it to him to call upon the owners or insurers of the cargo and freight for their contributory shares."

In Jumel v. Insurance Co., 7 Johns. 412, the same rule as to expenses was recognized though not applicable upon the facts.

The same point was also involved in the decision of Thornton v. Insurance Co., 12 Me. 150, where the insurers of the ship were held bound to pay to the owner certain expenses which he had incurred and paid, which were general average by our law, but which under a foreign adjustment had been excluded and thus were not collectible from the cargo.

In Providence & S. S. S. Co. v. Phœnix Ins. Co., 89 N. Y. 559, the whole salvage expense amounting to $21,840 was adjudged to be paid by the insurer, although as above stated, a general average adjustment had been made.

The German Code of 1897 recognizes the same general principle, though modifying it to some extent, by providing (section 838) that after a regular adjustment of general average, the assured can recover of the insurer so far only as the assured has not obtained the indemnity due to him by such lawful proceedings as were conveniently available; while section 839 enacts, that if no adjustment has been made, without fault of the assured, he can recover his entire loss according to the conditions of the policy.

The French Code of Commerce is not explicit on this point; but the right to look to the insurers in the first instance for the whole loss, seems to prevail. See 4 Cresp. & L. 203, 204; 1 Rev. Int. Droit Mar. 59, 653, note.

Lowndes in his works on Average (3d Ed. pp. 231, 232) and on Marine Insurance (page 207), recognizes the American law on this subject. If I were at liberty to depart from it, no sufficient reason seems to me to be shown for doing so. The contracts of insurance were made here, and are to be construed by our law. A rule so long established may well be deemed to enter into the contract, as the understanding of the parties to it. This rule makes the law consistent and harmonious; it treats alike, as respects a recovery of indemnity from the insurers, all sacrifices, whether of goods, of ship's material, or of the ship's expenditures, whenever such expenditures were necessary for the vessel's own safety.

It is said that when the cargo is much more valuable than the ship, it is unreasonable that the insurer of the ship should be required to advance to the assured what the cargo owner ought to pay him. But in every such case the whole expense having been indispensable to the safety of the ship, the insurer receives the full benefit of it by

being thereby saved from a larger loss. The salvage expenses being a loss within the policy, and the whole being to the advantage of the insurer, it is most reasonable that the insurer should at once indemnify the owner, according to the insurance agreement, and himself, rather than the assured, bear any risk or delay that may attend the recovery of indemnity from others.

Aside from the small fraction to be charged against the libelant as owner of the freight interest, the defendants have in fact received in the present case all the deductions to which they are entitled as respects the salvage expenses, as distinguished from the direct injury to the ship by sanding. The proportion of the salvage expenses chargeable respectively against the ship and freight and against the cargo, has been judicially separated and adjudicated. Both these adjudications are binding upon the defendants as well as upon the libelant. The defendants in the first libel were by intervention made parties to that litigation; the other defendants must have had knowledge of the proceedings and might have become parties had they desired. The amounts payable by the cargo, as well as by the ship and freight, have therefore been fixed; and in the absence of any reservations (The Col. Adams [D. C.] 19 Fed. 795) I do not see how those adjudications can be reopened or disregarded in any other proceeding between these parties. The libelant has paid both sums as thus adjudicated. No claim is made in these suits for the amount of salvage expenses paid by the libelant on account of the cargo or the freight. Both have been deducted; the cargo's share, by judicial separation; and the principal part of the share chargeable to freight, by voluntary deduction of its arithmetical proportion; a deduction somewhat in excess of its true proportion, as the freight stood more closely analogous to the charges upon cargo than to the charges on the ship. This defense should, therefore, be overruled.

3. It is further urged that the amount adjudged to the salvors in the libel against the ship and freight, was based on a valuation of the steamer of $2,000,000, and that as the policy valuation is only about two-thirds of that sum, the claim for indemnity on account of that item against the insurers should be reduced in the same proportion; since that would be done, it is said, in a direct suit against the insurers to recover average contributions paid by the assured. If in such a suit that rule would apply to the New York practice in general average, I see no reason why it should not be adopted in the present cases. For although a judicial award against the ship stands pro tanto in lieu of an average adjustment, and, so far as it goes, and in the absence of any reservation, binds both the defendants and the libelant as to the amount to be allowed for the salvage services and also as to the division thereof between cargo, ship and freight, it is not conclusive as to the share that any or all of the insurers should pay of the amount adjudged in the salvage suit. No such issue was involved in that suit, and none such could have been introduced into it.

The rule on this point in England and in Massachusetts appears to be as the defendants contend. If the policy value of the ship is less than her contributory value adopted in the average adjust-

ment, the same proportionate rebate 'is made upon the average as-sessment against the ship when indemnity is sought against the in-surer, unless otherwise provided in the policies. 2 Phil. Ins. §§ 1410, 1479; 2 Arn. Ins. (6th Ed.) p. 916; Tyser, Ins. § 239; McArthur, Ins. 72; Gow, Ins. 307; Clark v. Insurance Co., 7 Mass. 365. The rule on this subject, however, as on so many other points in general average, is not uniform. Phillips expressly states (Phil. Ins. §§ 1410, 1479) that the rule in New York is otherwise. There, he says:

"The underwriters contribute the whole amount assessed upon the subject in general average, whether it contributes on a value greater or less than that at which it is fixed in 'the policy, and so proportionally if one-half, one-quarter or any other proportion of the value is insured. The cases seem, however, to be on the side of the adjustment as stated in Boston."

Dix. Ins. p. 44, states the same practice in New York at the date of his work (1862). Phillips further observes (Phil. Ins. § 1410):

"There is nothing in the (ordinary) policy that favors one of these modes of construction in preference to ·the other, each being equally consistent with the language of the instrument, and the preference of one or the other being merely a matter of construction and the application of the general principles of insurance."

In my view, the New York rule is most consonant with the 'terms of valued policies and with the object of a valuation, which is to limit both parties on the question of value. Insurance Co. v. Hodg-son, 6 Cranch, 206, 220, 3 L. Ed. 200. When the value has been fixed by agreement, the owner should not be compelled to stand con-structive insurer (in a settlement between himself and his actual in-surers) of any uninsured value of his ship beyond the amount agreed on in the policy. Yet that is the precise effect of the English and Boston rule. In case of total loss, or of partial loss and repair, the owner is held estopped from claiming beyond the agreed value. The estoppel ought to be mutual (3 Kent, Comm. 274); and the insurer who has agreed to a fixed value of the ship, ought not to be allowed, in case of a loss within the policy, to reject the valuation and to re-duce the claim upon him on the mere ground that the vessel is worth more than the sum agreed upon, and that the owner should stand con-structive insurer as to the excess, and bear, with the actual insurers, a pro rata share of the loss. Such a rule is unequal and unjust, since it enforces the valuation as against the owner, but ignores it as against the insurer. If there would be some equity in favor of that rule where the undervaluation was unknown or concealed, there would seem to be none where, as in the present case, there can be no doubt that the undervaluation was known to the insurers, accepted by them as the basis of the contract, with presumably an increased rate of premium proportionate to any increase of risk incidental to the undervaluation.

The New York rule was recently applied in the court of appeals in a very extreme case of undervaluation (Providence & S. S. S. Co. v. Phœnix Ins. Co., 89 N. Y. 559) where the Sound steamer Massa-chusetts was valued at $75,000 and insured for that sum, her actual value being $275,000. Through stranding she was damaged and afterwards repaired for $46,000 and her owners also paid $21,840

for salvage and similar services in getting her off. The insurers voluntarily paid the repair bill of $46,000 in full; but after a general average adjustment had been had, demurred to paying the full bill for salvage expenses on the precise ground above stated; but the court of appeals, reversing the general term (22 Hun, 517) adjudged the whole salvage also to be paid by the insurers. Had the insurers been entitled to a reduction either upon the cost of repairs or on salvage expenses in proportion to the undervaluation, as here claimed, they should have paid only $^{75}/_{275}$ or about $^{3}/_{11}$ of the $46,000 for repairs, and the same fraction only of the salvage, instead of the whole of it.

One clause of the policies also seems to support the New York rule as the one here intended to be applied. It reads:

"Average payable without deduction, whether particular or general, and no one-thirds new for old, to be deducted."

The first part of this clause is new in being applied to general average, and also in being independent of, and additional to, the ordinary provision for a "deduction of one-third new for old." The literal reading of the first part of this clause in effect is:

"General average shall be paid without deduction." These are apt words to exclude just such a deduction from general average assessments as is here claimed; and I do not know of any other deduction that might be made from "general average payable" by the insurer, to which those words could apply.

Whether such be the meaning of this particular clause or not, the New York practice early and late seems settled in this regard. And even if the ordinary policy be, as Phillips considers it, as consistent with one construction as with the other, a long-settled usage as to its construction and meaning in the place where the policy is issued and is to be performed, ought not to be disregarded in cases of ambiguity, but be deemed to supply the construction that was intended by the parties.

By the ordinary rule, general average adjustments are to be made and paid according to the law of the port of discharge; and these policies contain a clause providing that general average shall be payable (at the option of the assured) according to the rules of the port of discharge; so that the New York rule must govern in this case. Any analogy, therefore, based upon the payment of average contributions by insurers at this port, sustains the libelant's contention for full payment, rather than the defendants'.

4. The defendants further contend generally, and on the same ground as above stated, that as the St. Paul was valued in these policies at only about two-thirds of her actual value, the insurers are not liable for more than that proportion of their insurance upon any partial loss, whatever its amount or nature; claiming that the same rule of deduction that is applicable to goods, should be applied to every loss on ship also, when once the amount of the loss is ascertained.

No doubt that is substantially the result of the rule applied to partial losses of goods under valued policies. The damaged goods are to be sold on arrival, and the gross proceeds compared with the

market value of sound goods at the port of discharge; and the ratio of the loss to the sound value, as thus ascertained, is the proportion to be paid by each underwriter upon his policy. This was the rule applied by a special jury of merchants to whom Lord Mansfield submitted the question in the leading case of Lewis v. Rucker, and which he afterwards on reargument illustrated and confirmed. 2 Burrows, 1167. It is now firmly established as respects merchandise. Phil. Ins. § 1203; 2 Arn. Ins. (6th Ed.) 928–933; Tyser, Ins. §§ 215, 225; McArthur, Ins. p. 247; Gow, Ins. p. 196; Johnson v. Sheddon, 2 East, 581; Tunno v. Edwards, 12 East, 488; Lawrence v. Insurance Co., 3 Johns. Cas. 217; Insurance Co. v. Buckner, 5 Miss. 63; Stanton v. Insurance Co., 6 Miss. 744; Insurance Co. v. McGlashen, 54 Ill. 513; Francis v. Boulton, 65 Law J. Q. B. Div. 153. This general rule as to goods, has been recently recognized by the supreme court also in the case of London Assur. Co. v. Companhia de Moagens, 167 U. S. 171, 17 Sup. Ct. 785, 42 L. Ed. 113, and the same rule seems applicable to partial losses of freight when the gross freight is ascertainable. 2 Arn. Ins. (6th Ed.) 949; McArthur, Ins. 235; Gow, Ins. 202; Griswold v. Insurance Co., 3 Blatchf. 231, Fed. Cas. No. 5,840; Fay v. Insurance Co., 16 Gray, 455.

The defendants contend that the same rule is to be applied to all partial losses upon a ship. If this contention is sound, it is remarkable, considering the long continuance and frequency of valued policies on vessels and of partial losses thereon, that no such rule should appear in the text-books and adjudications, but on the contrary a distinct recognition of the difference in this regard between ship and goods.

In the settlement of partial losses on goods under valued policies, there is of necessity a proportion struck between the loss and the value of sound goods in order to get at the amount payable by the insurer; but on partial loss or damage of the ship, no mention is made of any such proportion of loss to the actual value, but only of its proportion to the policy value. The basis of the defendants' argument on this head is, that "the real inquiry always is what proportional part of the subject of insurance is represented by the actual loss," by which is meant the proportional part of the actual value; whereas the authorities show that as respects vessels, the proportion applied is the proportion of loss to policy value.

Phillips says (Phil. Ins. § 1479):

"If the ship is valued at the amount insured, the insurer pays in particular average the whole expense of repairs, though it is a low valuation; and he pays no more where the valuation is high."

Tyser (Tyser, Ins. [1894] § 218) says:

"If the shipowner repairs the ship insured, he is entitled, as a general rule, to recover the sum properly expended in executing the necessary repairs, less the usual allowances. If the ship is insured in a valued policy, it makes no difference whether the value be a high or low valuation of the ship."

McArthur says (McArthur, Ins. pp. 219, 220):

"The underwriters are liable for such a proportion of the amount of the claim as the sum insured bears to the policy value, * * * but an alternative mode (the ship being unrepaired) is to compare the value of the ship

before with her value after the accident causing the damage, the difference being the amount of the underwriters' liability."

Arnold says (2 Arn. Ins. [6th Ed.] p. 940):

"The rule, therefore, for adjusting a particular average loss on the ship is very simple, namely, that in open policies, the underwriter pays the same proportionate part of the sum he has agreed to insure, as the damage, or the expense of repairing it, is of the ship's value at the commencement of the risk; in valued policies, he pays the same proportion of the valuation in the policy" (i. e. the proportion of the damage to the policy value).

Gow (Gow, Ins. [1894] p. 207) says:

"In indemnifying the assured for particular average on ship, the damage is estimated by a method which from its nature is usually inapplicable to other interests. * * * The measure of liability for particular average, is the cost of such repairs as will put the vessel in the same state of efficiency as she was in before the accident. They are apportioned over the insured value of the ship, each underwriter paying the same amount that his subscription bears to the insured value of the ship. No account is taken of the actual value of the ship as distinguished from the insured value, ships being treated differently from goods in that respect."

In only a single case, viz., that of Pitman v. Insurance Co., 9 Q. B. Div. 192, have I found it intimated that a partial loss on a ship, should be adjusted as upon a loss on goods. The case, however, was quite exceptional; for the ship, instead of being repaired, was sold by the assured for nearly her full actual value, and the insurers had offered to pay the residue; so that the only question before the court, was whether after having made such a sale, being actually indemnified in full, the assured could recover an excess up to the full amount that repairs would have cost, if made; and it was held that he could not. Lindley, J., in directing the judgment below, seems to adopt the same rule applied on a sale of goods upon a partial loss. But the judgment actually entered seems to have been quite different, and in accordance with the usual rule as to vessels, viz. for the payment of the owner's whole loss up to the policy value; whereas the rule as to goods would have allowed but $^{37}/_{40}$ of that loss. For on appeal to the court of appeal, Jessel, master of the rolls, says with such careful specification as to preclude any misunderstanding (page 204):

"The underwriters are willing to pay the whole of the loss actually incurred by the owners, viz., the difference between the value of the ship at the port of departure for the voyage, viz., £4,000, and the amount of the net proceeds of the sale after deducting therefrom the amount actually expended for (the previous) repairs, and this, as I read the judgment, is what they are to pay."

Cotton, L. J., says (page 215):

"The judgment of the court below has given the plaintiffs only the difference between the value of the ship in its uninjured state, and the sum realized by its sale, after deducting from this latter sum the cost of the (slight) repairs which were in fact done;"

—Whereas according to the rule applied to goods, the judgment as above stated, would have been for but $^{37}/_{40}$ of that difference.

All the judges on appeal repeatedly state in effect what Lord Justice Cotton several times repeats:

"As a general rule, where there is a partial loss in consequence of injury to a vessel, by reason of perils insured against, the insured is entitled to recover the sum properly expended in executing the necessary repairs, less in each case,

where the vessel was not at the time of the injury a new one, the usual allowance of one-third for old; * * * the sums expended in repairing * * * are damages sustained by reason of the perils insured against * * * and the insured is entitled by way of indemnity to the cost so insured." Pages 215, 216, 204, 208.

This is the same rule long recognized by the text-books.

From the opinion of Brett, L. J., it further appears that that case was twice argued in the court of appeal, and that on the second hearing the contention that ships and goods were subject to the same rule on a partial loss, which was first contended for, was abandoned. He further states that the rule of computation adopted by Lindley, J., was an innovation; while the master of the rolls states that he does not concur in all the reasons assigned by Lindley, J. Page 205. Considering these circumstances, the rule as laid down by the several judges on appeal in the expressions above quoted, amounts to a deliberate rejection of the rule applied to goods, and an adherence to the long-existing rule as stated in the text-books in the case of partial losses on ships.

In the subsequent case of Marine Ins. Co. v. China Trans-Pacific S. S. Co., 11 App. Cas. 590, a valued policy, Lord Herschell, Ch., referring to the case of Pitman v. Insurance Co., states and adopts as his own the opinion "of all the judges" of the court of appeal, that

"Where there is a partial loss in consequence of injury to a vessel by perils insured against, and the ship is actually repaired by the shipowner, he is entitled as a general rule to recover the sum properly expended in executing the necessary repairs, less the usual allowances" (i. e. one-third new for old).

And Fry, J., states the same rule in the court of appeal. 11 App. Cas. 582.

In the previous case of Lohre v. Aitchison, 2 Q. B. Div. 501, where the vessel was repaired, the rule applicable to damaged goods, as I understand the facts (page 506), would have been satisfied with a payment of 84 per cent. on the policies; but the assured, having repaired his vessel, as he had a legal right to do, was decreed to be entitled to recover the expense of his repairs up to the amount insured by the policy, though the policy value was but $^{13}/_{15}$ of the full value of the ship; and this was affirmed in the court of appeal and by the house of lords (3 Q. B. Div. 558; 4 App. Cas. 755).

In rejecting the rule applicable to goods, Lush, J., says (Lohre v. Aitchison, 2 Q. B. Div. 507–509):

"If ships were kept merely for sale, it might reasonably be contended that the same principle should be applied which is applied to damaged goods. But a ship is intended to be used for profit. The owner is in many contingencies bound to repair. He has always the right to repair, and it is in the contemplation of both parties that if damage happens the ship will be repaired if it is worth the cost. If, instead of repairing, the owner chooses to sell the ship in her damaged condition, he fixes his loss at the difference between what she was worth at the commencement of the risk and what she sold for. But if he elects to repair, the loss is ascertained by the cost of the repairs, less a proper deduction on account of having new timber for old. Nothing short of this would be an indemnity. * * * The contract is not to pay £1,200 in the event of a total loss only, and a smaller sum if the loss is only a partial one. If this had been the intention it should have been so expressed. What the underwriter engages to pay is any loss which the assured may incur from the perils assured against, not exceeding the specified amount."

In the same case in the house of lords (4 App. Cas. 755, 762) in affirming the judgment of Lush, J., Lord Blackburn says:

"The parties to a policy of insurance on a ship tacitly agree that in case of repairs fairly executed to replace damages (by sea perils), the loss shall be estimated at ⅔ the cost of the repairs" (i. e. deducting one-third new for old).

In the recent case of Providence & S. S. S. Co. v. Phœnix Ins. Co., 89 N. Y. 559, above cited, the same rule was adhered to. Four-teen insurance companies were there the insurers; and, as above stated, they voluntarily paid the full repair bill of $46,000, instead of about $12,500, which, according to the defendants' contention, would have been all for which the insurers were liable.

Considering the very great undervaluation in that case (viz., $75,000 as against $275,000, the actual value), the large number of companies involved, and the great difference in the result of the different modes of ascertaining the sums payable by the insurers, that case affords the strongest evidence that the rule as above stated, is perfectly understood among insurance companies themselves to be the true construction of the policy, and the measure of their liability for a particular average loss in valued policies on a ship. See Bradlie v. Insurance Co., 12 Pet. 404, 9 L. Ed. 1123.

This rule, therefore, seems to me as firmly established as any point in the law of marine insurance,—that insurers pay for a particular average loss to a ship in the proportion that the loss bears to the policy value, and not in proportion of the loss to the actual value, as the defendants contend. That rule must be followed here. It manifestly applies to the damage to the hull from loosening rivets, etc., but is subject to such deductions, if any, as the memoranda attached to the policies provide.

The same rule must also apply to any other damage or loss to the ship that is within the policy and covered by the express contract to insure against sea perils and against other kindred perils covered by other clauses in the policy. The fact that such other losses, when expressly covered by the policy, may be a subject for general average adjustment and contribution, has no bearing on the insurers' liability, or the amount of it; but only serves to give them a right of subrogation as above stated.

In the case of Providence & S. S. S. Co. v. Phœnix Ins. Co., supra, it was assumed in the decision at general term (22 Hun, 517) that the insurers were liable for the repairs without reference to the actual value of the ship. Barrett, J., in delivering the opinion, seeks, however, to distinguish the salvage expenses from the repairs to the vessel, saying (page 523):

"The fallacy of the plaintiff's position with regard to it (i. e. the salvage expenses, including certain average contributions paid by the plaintiff for a jettison of a part of the cargo during the salvage operation. See statement of facts in Mr. Evarts' argument, Cas. Ct. of App. vol. 618) consists in treating the expenditure in question as damages resulting directly from the perils insured against. They thus put this expenditure upon precisely the same footing as that incurred for the repairs necessitated by the accident; and, upon the same principle, claim full indemnity therefor. This is an erroneous view of the underwriter's engagement. Primarily he agrees to pay for the loss of the thing insured, or some part of it. That, of course, would cover the repairs. There, however, the liability would stop, but for the 'sue and labor' clause,

and the contract to pay general average. The latter engagements are entirely distinct from the direct liability for damages occasioned ·by the perils insured against. They are simply undertakings to contribute—that is, to bear a due proportion of the expense."

While full liability for repairs is thus conceded, it is assumed that necessary general average losses and expenses for salvage, are not covered by the insurance against sea' perils and other perils of a kindred character, but only by the sue and labor clause—contrary to the decision of the house of lords in Aitchison v. Lohre, supra. In continuation it is further said:

"It is clear then, that the defendants are only bound to contribute to the expense incurred in getting the steamer off. It is equally clear that their contribution should be proportionate to the value of the steamer, as fixed in the policy. * * * The truth is that the plaintiffs were their own insurers to the extent of $200,000. Upon that amount they are bound to contribute. * * * If, therefore, that which is really saved by the sacrifice or expenditure is something more than the policy value of the thing insured, the expense must be divided ratably between the value saved to the insurer and the value saved to the assured, or to some third party."

As respects the obligation of the insurers to pay the whole of the ship's share of general average expenses and losses, the above quotations state the kernel of the defendants' contention, namely (1) that the insurers may prove that the ship is worth more than the sum agreed, and thereupon charge the owner as constructive insurer of the excess in value, and consequently bound to contribute ratably with the insurers, in diminution of the latter's liability; and (2) that these charges come under the sue and labor clause only; by which the insurers agree only "to contribute according to the rate and quantity of the sum herein insured"; which the defendants interpret to mean in proportion to the actual value of the ship, instead of the value agreed upon in the policy, which is what is meant in the passage quoted from Potter v. Insurance Co., 3 Sumn. 27, Fed. Cas. No. 11,335.

Both these contentions have been in effect overruled in the house of lords; the former, in Aitchison v. Lohre, supra; and the latter, in Irving v. Manning, 6 Man., G. & S. 391, in which it was said they were all of the opinion that the true meaning of the valuation clause is not for the purpose of ascertaining whether there is a total loss or not in reference to the cost of repairs; but that it means only

"That for the purpose of ascertaining the amount of compensation to be paid to the assured, when the loss has happened, the value shall be taken to be the sum fixed, in order to avoid disputes as to the quantum of the assured's interest. * * * In a valued policy, the agreed total value is conclusive."

In the case of Insurance Ass'n v. Armstrong, L. R. 5 Q: B. 244, Lush, J., says: ·

"The assured is not at liberty to say it is worth more. He is bound by that amount. It is for the purpose of avoiding all question about the value that the parties agree to fix that amount, and for that purpose, therefore, of adjusting the rights under that policy, both the parties are bound by that value."

And this rule seems to have been approved and applied in the case of The Potomac, 105 U. S. 630, 634, 635, 26 L. Ed. 1194.

The general term in the case of Providence & S. S. S. Co. v. Phoenix Ins. Co., above quoted, charged the owner as constructive insurer,

because he had in fact a large "quantum of interest" in the ship beyond the policy value; and on that ground it released the insurers from a large part of the general average expenses. The court of appeals in accordance with the latter decisions, and rightly, as I think, notwithstanding the present defendants' complaints, reversed the general term decision, on the ground that the insurers were estopped by the valuation from raising that question. 3 Kent, Comm. *274; Insurance Co. v. Hodgson, 6 Cranch, 206, 3 L. Ed. 200.

No doubt if some other thing than the thing insured, was benefited by the salvage, it should pay its equitable share. That is the simple law of general average adjustment. In all the cases here considered, the thing insured is the whole vessel, not simply a distinct aliquot part of it. What is valued in these policies, is not a certain fraction of the vessel, as of a part owner, but the whole vessel, and the entire quantum of the interest of the libelant, which owed the whole of it. The insurers are, therefore, estopped from claiming that, as respects the ship, any other or larger interest than that which they valued and insured, was benefited by the salvage service.

5. In cases of partial loss, the different rule applied to goods and freight from that applied to ships, has not arisen from any theoretical or even logical construction of the policy; but from practical considerations, having reference to the different purposes in insuring, the different circumstances of the subjects of insurance and the evident difference in the appropriate measure of indemnity.

The reason assigned by Lord Mansfield for the rule as respects goods, was in order that the proportion of the insurance chargeable to the insurers on a partial loss, might be the true proportion of the merchant's actual loss by the sea peril, and not fluctuate with the market price or profits, but be the same proportion, whether the goods came to a rising or a falling market. See, also, 2 Arn. Ins. (6th Ed.) pp. 928-933.

These reasons have little or no application to ships. Ships are not employed as merchandise, nor insured as such; but as carriers. If damaged, they are not expected to be sold, but to be repaired for continued use by the owner, or for the necessary completion of the voyage. Nor is there any such usual market for vessels as for goods, by which the loss or damage could be fairly ascertained by a sale; nor could sales of damaged vessels be ordinarily made or required, without great prejudice to all concerned—to the underwriters as well as to the assured. See per Brett, L. J., in Pitman v. Insurance Co., 9 Q. B. Div. 207. In fact, to require a sale of the ship on every marine accident, would be destructive of commerce. The absolute right of the owner, therefore, to repair the damage, is a commercial necessity; and it is perfectly established. 2 Pars. Mar. Ins. 337; 2 Arn. Ins. 1001; Humphreys v. Insurance Co., 3 Mason, 429, Fed. Cas. No. 6,871. The policy by its terms requires the insurer "to bear all the loss and damage that may come to the ship by sea perils," within the limit of the value named in the policy; and hence the repairs necessary to make the ship as good as before are evidently the proper measure of indemnity. See per Lush, J., in Lohre v. Aitchison,

supra, and per Brett, L. J., in Pitman v. Insurance Co., 9 Q. B. Div. 208, 209; Bradlie v. Insurance Co., 12 Pet. 378, 404, 9 L. Ed. 1123.

With goods or freight the case is different. Suppose (1) that A. at Demarara ships 500 hogsheads of sugar, there worth $5,000; B. insures it for $4,000, the policy value; on the voyage to New York half is lost by sea perils and half arrives sound; manifestly B. should pay $2,000, half the policy value. Nobody ever heard, says Phillips (Phil. Ins. p. 18, § 1203), of any different adjustment in such a case; that is indemnity for the loss at the rate of the agreed value; and similarly as to the loss of any other aliquot part of the cargo insured. But (2) if instead of being partly lost, all the sugar is damaged, so that on arrival it sells for one-half the market price of sound sugar, the case is not altered pecuniarily; and in that view, the payment of half the insured value or $2,000, as before, seems to be a reasonable and satisfactory indemnity. Yet by reason of the state of the New York market, the damaged sugar, selling at half price, may bring in one case $4,000; and in another case, but $1,000; so that the merchant in the former event would lose nothing on the policy value, but would in fact lose $4,000 through sea damage; while in the latter case, he would lose $3,000 on the policy value, and only $1,000 through sea perils. These different results would arise from a fluctuating market and variable profits, neither of which do the underwriters insure. Neither the insurer nor the assured should gain or lose from such accidental circumstances. These elements should, therefore, be eliminated; and this may be done by taking the proportion of loss to the sound value as ascertained by a sale at the place of discharge, and then taking that same proportion of the policy value, which will give the amount to be paid by the insurers pro rata, reckoning the owner as constructive insurer for any uninsured part of the policy value. This "rule of proportion" gives the same result as in the case first above put, of a total loss of the same proportion of the cargo, as a fair and appropriate indemnity independent of the fluctuations of the market. Such was the rule of Lord Mansfield's special jury of merchants, which has held its own, not because it was a strictly logical construction of the policy, but as giving an easy practical solution of a difficult question of adjustment under divers circumstances, and one that is proximately exact when the policy value is the true valuation, as it was formerly supposed to be. 3 Kent, Comm. *273. The inequalities arising under this rule have mainly grown out of the comparatively modern practice of excessive undervaluation or overvaluation.

It is a curious result of this rule of adjustment, however, that the policy value has no bearing upon the settlement of the amount to be paid by each underwriter, but only upon the amount of insurance that may be lawfully taken out; since each policy, up to the valuation, will pay by this rule the same amount, whether the valuation is high or low. Overvaluation in the policy, indeed, authorizes overinsurance to the same extent, if not fraudulent; because the insurer is estopped from asserting any excess in the valuation. The owner, if insured above the actual value of his goods, will thereby realize from the insurers more than his actual loss. But the mode of settlement on each

policy is precisely the same as upon an open policy; that is, to pay the same proportion of the insurance, that the loss bears to the sound value; and if any one policy does not insure more than the actual value, which rarely happens, it will pay the same amount that it would pay if the policy were open. Hence the maxim as to goods, that "a partial loss opens the policy," which to the above extent is correct.[1] The only effect of a valuation of goods or freight in the policy, is on the one hand to fix and limit the owner's right of recovery on a total loss; and on the other hand, to determine his right to insure up to the value named, and his corresponding obligation, as constructive insurer, for so much of the policy value as is not otherwise insured; and as I have said above, the insurers are estopped from claiming that his obligation as constructive insurer extends beyond that limit.

On partial losses of freight insured on valued policies, the likeness to partial losses on ships is less remote. But there is no damage to freight, and no sale of it, though there may be charges against that interest; the actual freight and the lost freight are both usually known and fixed directly in terms of money; whatever is lost is a definite arithmetical proportion of the whole actual freight list; so that lost freight is usually strictly analogous to a total loss of a certain proportion of the whole number of hogsheads of sugar insured, as in the case first above put; and in such cases that same proportion of the insurance, is the indemnity manifestly contemplated by the parties. Each insurer pays that proportion of his own insurance. It is the same proportion that would be adjusted upon an open policy. If the whole policy value is covered by policies, the owner will thereby receive full payment of his loss, according to the rate of the policy valuation; if less than the policy value is insured, the owner, as constructive insurer, bears the deficiency. There are some peculiar considerations, moreover, affecting valued policies on freight, which it is not necessary here to consider. The important and instructive case of Griswold v. Insurance Co., 3 Blatchf. 231, Fed. Cas. No. 5,840, was a case of large overvaluation, where, as I find from the files of the

---

[1] NOTE. If v represents the policy value of goods; s, the sound value at port of discharge; d, the difference or loss as ascertained by sale, and p, the amount insured by any particular policy, then each underwriter by the above rule must pay $\frac{d}{s} \times v \times \frac{p}{v} = \frac{d}{s}p$. This shows that the amount payable on any valid policy is independent of v, the policy value; and that the insurer pays the same amount on his policy whether the valuation is the actual value, (equaling an open policy) or higher or lower. If B., in the cases above put, insures for $2,000 instead of $4,000, the insurer pays the same sum, viz. $1,000, or half his insurance upon a loss of one-half of the actual value of the goods (s) whether the policy value be $4,000 or $10,000. This is because the insurance is never higher than the policy value, and because the owner is by law held to be constructive insurer for so much of the policy value, (or of the actual value, if the policy be open) as is not covered by the underwriters. It is often said that the proportion of loss is applied to the policy value; but this is immaterial—it has no bearing on the result  If the valuation and the whole insurance exceed the real value, each policy pays the same proportion still, but more in the aggregate than upon an open policy, because they insure for more, whether the excess in valuation over the insurance is greater or less.

circuit court, the freight was valued in the policy at $12,000 for the outward voyage, and $30,000 for the homeward voyage; and on the latter a full cargo was taken on board, with freight for about two-fifths of the valuation.[2]

This rule as to goods and freight has been so long established as to form one of the implied terms of the policy. When the valuation varies greatly from the true value, the result is indeed a wide departure from the literal agreement of the policy to bear the loss arising from sea perils; but considering that no great variation in the policy value fom the true value can ordinarily take place except with the knowledge and consent of both parties, each may well be held to abide the result of his venture, according to the conventional rule of adjustment. But this rule as to goods and freight, adopted upon grounds not applicable to ships, and liable to depart so considerably from the reading of the policy, should not be extended to ship's losses, to which it has never been applied.

The libelant should have a decree for the sums claimed with costs, less such deductions as above directed for charges against the freight interest owned by the libelant, as may be determined upon a reference in case the parties do not agree thereon.

---

[2] NOTE. In that case the whole actual freight on the return voyage was $12,795.31; had the freight been insured by the underwriters to the full policy value of $30,000, the assured upon his actual partial loss of less than $5,000 of the freight would have recovered by reason of the great overvaluation upwards of $12,000; whereas by the rule as to ships he would have recovered only indemnity for his actual loss, each insurer paying in proportion of such loss to the policy value.