TWEEDIE TRADING CO. v. WESTERN ASSUR. CO. OF TORONTO.

SAME v. HIGGINS et al.

(Circuit Court of Appeals, Second Circuit. April 18, 1910.)

Nos. 179, 180.

1. INSURANCE (§ 138*)—MARINE INSURANCE—CONSTRUCTION OF POLICY.
  Certificates insuring freight, issued under running policies, are not invalid because the policies are upon cargo; but the policies, for the purpose of such certificates, must be read with the substitution of freight for goods and merchandise.

  [Ed. Note.—For other cases, see Insurance, Cent. Dig. § 246; Dec. Dig. § 138.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. INSURANCE (§ 115*)—MARINE INSURANCE—FREIGHT—INSURABLE INTEREST.
　　The chartered owner of a steamship, which subchartered it for a voyage for a lump sum, one half to be paid in advance and the other half by the bill of lading freight, has an insurable interest in such freight.
　　[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 154–157; Dec. Dig. § 115.*]

3. INSURANCE (§ 415*)—MARINE INSURANCE—FREIGHT—SEAWORTHINESS OF VESSEL.
　　Under a charter of a vessel to carry a cargo of live stock, the fodder to be provided by the charterer, the fodder was an appurtenance of the cargo, and not of the vessel; and the fact that it was not of proper kind, by reason of which there was an excessive mortality among the animals on the voyage, did not render the ship unseaworthy for the voyage, nor affect the right of the owner to recover on policies insuring the freight, including the risk of mortality.
　　[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1111; Dec. Dig. § 415.*]

4. INSURANCE (§ 489*)—MARINE INSURANCE—EXTENT OF LOSS—EXPENDITURES UNDER SUE AND LABOR CLAUSE.
　　Under the sue and labor clause of marine policies insuring freight on a cargo of live stock, where, because of the refusal of the cattlemen shipped to work, the ship was compelled to deviate from her voyage to procure others, the insurers are liable in the first instance for the expenses incurred in such deviation, being subrogated to the right of the insured to recover contribution in general average.
　　[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 489.*]

Appeals from the District Court of the United States for the Southern District of New York.

Suits in admiralty by the Tweedie Trading Company against the Western Assurance Company of Toronto and against A. Foster Higgins and others. Decrees for libelant (168 Fed. 962), and respondents appeal. Affirmed.

Wing, Putnam & Burlingham (Charles C. Burlingham and L. Everett, of counsel), for appellants.

Ralph J. M. Bullowa (F. M. Brown, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. July 8, 1904, the libelant, described as the time chartered owner of the steamer Nordkyn, subchartered her carrying capacity to James Graham for a cargo of live stock and general merchandise from New Orleans to Cape Town, South Africa. The charter to the libelant is not in evidence; but we shall assume, from the description of the libelant in the subcharter as time chartered owner, that it was owner pro hac vice. The libelant claims to recover the bill of lading freight per head on animals which died during the voyage, amounting to some $3,000, and also expenses incurred under the sue and labor clause, amounting to some $2,000.

The material articles of the charter party are as follows:

"4. Also that the total amount of freight payable by the parties of the second part is to be a lump sum of £4,250 Br. Stg. in full of all primage, port charges, dues, pilotage, etc., at both ports of loading and discharging. One half of this total amount of freight say £2,125 Br. Stg. to be prepaid by the parties of the second part at New Orleans, on signing of Bills of Lading by the Mas-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ter. The remaining one half, say £2,125 Br. Stg. to be paid on delivery of the live stock, etc., at Cape Town, S. A. Bills of Lading to give ship lien on live stock, etc., for the balance of freight due this balance to be insured at charterer's expense for ships benefit against all risk including mortality. Insurance certificate to be turned over to the Tweedie Trading Co. as soon as received by Jas. Graham and Jas. Graham to notify the Tweedie Trading Co. before sailing of where insurance effected and conditions."

"7. Also that the Captain shall sign Bills of Lading as and when presented without reference or prejudice to this charter party, any difference in freight to be settled at port of loading before sailing, if in charterers favor, by Captain's draft payable five days after arrival at Cape Town, if in steamers favor, in cash at New Orleans less the insurance."

"9. Also that charterers to supply live stock fittings, furnish cattlemen, feed and fodder for the live stock at their own expense and to load and discharge the ship free of charge.

"10. Also that the ship is to pay for vitualing the cattlemen, furnishing them with ordinary cattlemen's food and returning them to a United States port via port or ports."

Upon shipment of the cargo at New Orleans, Graham prepaid one-half of the freight, £2,125, and the master signed bills of lading calling for freight payable at a fixed rate on each animal delivered at Cape Town, aggregating £2,125.6.10. Freight on each animal dying during the voyage would, of course, be lost. To cover this contingency, Graham took out certificates of insurance under running policies of the defendants, the Western Assurance Company of Toronto and the United States Lloyds, for the precise amount of the bill of lading freight on each head of live stock, against, among other risks, the risk of mortality; every animal being a separate subject of insurance.

Two of the running policies under which the certificates were issued were upon cargo, but we think this discrepancy presents no real difficulty. The subject of insurance under the certificates being freight, the running policies must be read with the substitution of freight for goods and merchandise. Many of counsel's contentions, arising from the use of printed forms not consistent with the real agreements of the charter, may be disposed of in a similar manner. The certificates, though payable to the order of Graham, provide that they are to be treated "as if the property was covered by a special policy direct to the holder of this certificate."

The libelant sues as the holder, and we have no doubt that the arrangement between it and Graham was that it was to be paid the balance of the charter hire by the bill of lading freight per head on animals delivered, and to be protected against loss of freight resulting from death of animals by the insurance which Graham took out. The libelant's insurable interest is perfectly clear, and that is all it need prove.

Even admitting the foregoing, the respondents still contend that the libelant cannot recover because the extraordinary mortality was due (and we shall assume this to be so) to the shipper's failure to supply enough bran or oats along with the natural or prairie grass hay to make the fodder digestible by the live stock, and that this amounted to unseaworthiness of the vessel. Assuming the mortality to have been caused as stated, the conclusion depends upon whether the fodder is to be regarded as an appurtenance of the vessel or of the cargo. If·

of the vessel, the libelant cannot recover because of the implied warranty by all interests insured on the voyage of the seaworthiness of the vessel. Sleigh v. Tyser, L. R. [1900] 2 Q. B. D. 333. But there is no such implied warranty of the fitness of the cargo. As the libelant had nothing whatever to do with the fodder, we do not think its insurance on freight is affected by the character of the fodder, even if of an improper kind, or, as alleged in this case, of insufficient variety. Consequently the libelant is entitled to recover for the bill of lading freight lost on the live stock which was not delivered. ·

This brings us to the claim under the sue and labor clause. Some of the cattlemen supplied by the shipper having refused to work on account of the fare furnished them, the master deviated to Barbados to discharge these men and secure others in their place. We cannot say he was not justified in doing so. This cost the libelant:

| | |
|---|---:|
| 7 days 18 hours, at £750 per calendar month, equal | $ 924 71 |
| Coal consumed during that time | 764 88 |
| Extra victualing of cattlemen | 84 00 |
| Laurie & Co. bill | 257 48 |
| Total (Int. from Sept. 1, 1904) | $2,031 07 |

These expenses were incurred solely to prevent the mortality of the live stock, and incidentally the loss of the freight which was insured. It was a direct loss, recoverable under the policies from the underwriters in the first instance. The Pomeranian, Prob. Div. [1895] 349. Evidently the deviation was even more for the benefit of the owners and insurers of the cattle, but upon payment the underwriters on freight would have been subrogated to the right of the insured to recover contribution in general average (The St. Paul [D. C.] 100 Fed. 304), and this could have been adjusted between the two interests of freight and cargo only.

As the underwriters upon the cattle were the same as the underwriters on the freight, no inconvenience arises from the circumstance that the master did not take steps to secure average bonds and to have a general average adjustment made at the port of destination.

The District Judge found that the shippers had exercised unusual care to provide fodder, proper in kind and variety, and held that the underwriters would be liable, even if it had proved not to be so. Although we have not deemed it necessary to go into the subject, we agree with his conclusion in respect to both fact and law.

Decree affirmed, with interest and costs.